Collier
v.
Whipple·

COLLIER, *appellant*, and WHIPPLE, *respondent*.

A *master's sale* on a *mortgage foreclosure* will be opened and a *resale* or-
dered where *judgment creditors* are prevented from attending and bid-
ding at the sale, in consequence of an impression received from the
master, that the sale will not take place on the day appointed, although
there is no *collusion* between the master and the purchaser: provided
that the judgment creditors offer to make an advance at a resale upon
the bid at which the property was struck off, to an amount sufficient to
cover their demands.

APPEAL from chancery. A decree having been made for
the sale of two lots of land, upon the foreclosure of a mortgage
executed by one *Aaron A. Moore*, and the premises being ad-
vertised to be sold on the eighth day of *April*, 1833, the sale
was postponed by the chancellor until the further order of the
court, upon the application of *B. Knower* and *M. Whipple*,
two judgment creditors of *Moore*, who asked for particular di-
rections to the master in reference to such sale. On the *sixth*
of *June* the chancellor made an order, directing $808,59, part
of the monies due to the mortgagees, to be raised by the sale
of one of the lots, viz. lot No. 12, and the residue to be raised
by the sale of lot No. 13, the other of the lots. On the *seven-
teenth* of *June*, the master, who had advertised the property, sold
the lots at auction to *J. A. Collier*, the solicitor of the com-
plainant, who bid $815 for lot No. 12, and $2400 for lot No.
13. On the *twenty-sixth* day of June, the master executed a
deed, conveying the lots to the purchaser, who, on the same
day, conveyed lot No. 12 to *Joshua Whitney*, who, subsequent
to the date of the mortgage and previous to the foreclosure,
had become the owner of the lot by purchase from Moore.
On the *first* of *July* the master's report of the sale was filed,
and an order for *confirmation, nisi*, &c. entered in the register's
office. Previous to the order of the *sixth* of June, *Knower*,
who acted in behalf of himself and *Whipple*, instructed an
agent at Binghamton, in the county of Broome, where the
premises were advertised to be sold, to attend the sale, and to
bid for lot No. 12 $808, and for lot No. 13 $3500 ; which in-
structions were communicated by the agent to the master;

who was desired to give the agent notice when the sale should take place. On the morning of the *seventeenth* of June the master called at the office of the agent, and after a conversation between them in relation to the sale of the premises, the master went away, leaving the impression on the mind of the agent that the sale would not take place ; in consequence of which he did not attend at the place of sale, which was in the vicinity of his office. In half an hour the master returned, and informed the agent that the sale had taken place. On the *twenty-eighth* of June notice was given to the *purchaser* that application would be made to the chancellor for a resale, as soon as the necessary papers could be prepared, and on the *eighteenth* of July notice of such application was given for the first Tuesday of August. The motion was resisted by the *purchaser*, who disclaimed all collusion in the matter, and the master made an affidavit, stating that the proceedings on his part were had in good faith, explaining the circumstance of his interview with the agent on the morning of the day of sale, but admitting that in the course of the conversation he told the agent that *he did not know* whether he would adjourn the sale or not. In the petition for a resale, *Whipple* set forth the instructions given to the agent, and stated that *Knower* was still willing to bid for the property the amount he had authorized the agent to bid for the same. The chancellor, after hearing counsel, made an order, *setting aside the sale* of lot No. 13, and ordering a *resale* of the same ; directing the master to put up the lot at $3500, the sum offered to be bid for it by Whipple, and decreeing that, unless such sum was bid, the former sale should stand confirmed. He further directed, that out of the proceeds of such resale Collier should be refunded the amount of his bid upon lot No. 13, together with the interest thereof ; reserving the question of costs of such motion, and all other questions, until the coming in of the master's report. From this decree *Collier*, the purchaser, appealed to this court.

The appeal was argued in this court by

*J. A. Collier*, in person.

*A. Taber*, for respondent.

The following opinions were delivered :

By Mr. Justice NELSON. The material question in this case is, was the sale of the master free from objection, and ought it to be adjudged valid ? I lay out of view the manner in which it was conducted at the place of sale, and also the prices at which the property was sold.

In England the advance offered, under the circumstances, would be sufficient of itself to justify the order of the court below ; but that court does not profess to act upon the English practice, and in my judgment for sound and conclusive reasons. *Vide* 2 *Page,* 99. Before confirmation it is a matter of course, in England, to open the biddings upon an offer of a reasonable advance on the amount bid, and indemnity to the purchasers. *Newl. Pl.* 168. After confirmation the rule is more strict, and depends more or less upon the circumstances of the particular case. This is the practice of our courts ; and the cases in England, of applications to open biddings, after confirmation of sale, may serve to throw light upon the question here. In *Watson* v. *Birch.* 2 *Vesey,* 54, Lord Com. Ashurst, after taking time to consider the subject, said, that as a general principle, biddings are not to be opened after confirmation of the reports, unless under particular circumstances ; that increase of price *alone* was not sufficient, but if *fraud* appeared, it suspended the operation of the general rule ; but he did not mean to say that fraud was the only possible exception. In *Morrice* v. *Bishop of Durham,* 11 *Vesey,* 57, Lord Ch. Eldon is reported to have said, " that the only case in which the biddings can be opened after confirmation of the reports, is where there is some fraud or misconduct in the purchasers, or fraudulent negligence in another person as agent, of which it is against conscience that the purchasers should take advantage." In *White* v. *Wilson,* 14 *Vesey,* 151, the same distinguished individual decided that surprise, generated by the person having the benefit of the sale, was sufficient ground to

open the biddings, and he opened them in that case for that
reason. These cases, without going farther, sufficiently show
that *fraud* or *misconduct* in the purchaser, or fraudulent neg-
ligence in any other person connected with the sale, as the
agent of the mortgagor, or of persons interested as judgment
creditors, and also *surprise* created by the conduct of the pur-
chaser, will induce the court to open the biddings. The lat-
ter principle was applied in *Williams* v. *Dale,* 3 *Johns. Ch. R.*
296, by Chancellor Kent, who was disposed to be somewhat
strict in his practice on this subject. As that case has a con-
siderable bearing upon the present one, I may be indulged in
briefly stating it. The property was advertised by the mas-
ter, and the plaintiff, on receiving a partial payment, stated
to the agent of the defendants that he would show every rea-
sonable indulgence for what remained due; from which the
agent understood that the plaintiff would not compel a sale of
the property, but would wait a reasonable time. The solicitor
also confirmed the impression, by afterwards expressing his be-
lief that the plaintiff would not sell, but deemed it proper to
continue the advertisement. These conversations and im-
pressions of the agent were communicated to the defendants,
and induced them to believe that the property would not be
sold, and for this reason they were surprised by the sale, and
not prepared to meet it, as they otherwise would have been.
The learned chancellor opened the bid, on the ground of un-
intentional surprise by the party and his solicitor, for he con-
ceded they were not actuated by any unfair intention, either
before or at the sale. He examined the English cases, and
considered it as falling within the decision of Lord Eldon, in
*White* v. *Wilson.* In the same year the case of *Lansing* v.
*M'Pherson,* 3 *Johns. Ch. Cas.* 424, was decided. In that
case the sale was opened in behalf of a person who stood re-
sponsible for the balance due on the bond and mortgage after
the sale, and who offered fifty per cent. more than the bid. No
unfairness in the conduct of the purchaser was pretended.
The excuse was that the applicant did not know until after
the sale that the plaintiff had a decree compelling him to
pay the *deficit,* the decree having been entered by default.
The order was placed upon the ground that justice requir-

ed it.  The plaintiff was the purchaser, no deed had been given, nor had the sale been confirmed.  The two circumstances last mentioned are to be found in both these cases; but I do not consider them as distinguishing features from the one under review.  Here notice of an application was given to the purchaser before the report of the master was made, or order of confirmation entered, and the delay in making the motion was fully accounted for.  As to the deed, it was taken subject to the jurisdiction of the chancellor over the sale.  2 *Paige*, 341.  12 *Johns. R.* 526,  Neither does the fact in the last case, that the *plaintiff* was the purchaser, appear here; but no distinction can be made in this respect between the client and his solicitor.  It appears to me that the last case would support the order of the chancellor, without the aid of the circumstances of surprise or unfairness.  It seems to have been distinguished from those preceding it, on the ground of the sacrifice of the interest of the party applying, and that the plaintiff was himself the purchaser; and this appears to me as a sound distinction.  All the plaintiff is entitled to is his debt; that end is not defeated by opening the bid, but generally attained; and the control which he has, right or wrong, over the proceedings down to the sale inclusive, should induce courts closely to scrutinize his connection with it.  The same remarks are applicable to the solicitor, who is but the agent of the plaintiff, and the sale usually takes place under his superintendence.  But I do not intend to place the case upon this ground.  I have satisfied myself, after a careful attention to the facts, that the sale cannot be upheld, on account of the conduct of the master, which was calculated, and did in fact produce *surprise* upon the agent of Whipple, and others interested in the sale.  I will not stop to show that surprise, created by him or his conduct, is as injurious and as available in an application of this kind, as if caused by a purchaser, which all the cases concede is sufficient.  His conduct, above all others, shall be unequivocal and above exception.  To permit a party to suffer by it would establish a principle, that would make all interested in property forced under his hammer, responsible for the fidelity with which he executed his trust, though he be selected by their adversary.  The general prin-

ciple, also, that a party shall not suffer wrong by the error of an officer of the court, is familiar, and strictly and literally applicable to this case.

To appreciate properly the conduct of the master, it is material to consider the extent of his power over these sales ; for his duty is intimately connected with it.   He fixes the *time* when, and the *place* at which the sale shall take place, *Chancery Rules*, 138, 2 *R. S.* 368, § 34, 35, 37, 38, except in the city of New York, where the merchants' exchange is designated.   He may adjourn the sale for cause shown, and is bound to exercise a reasonable discretion in the matter.   2 *Paige*, 339.   He has, in fine, every power, and is subject to the same duties as are possessed by and imposed upon sheriffs, in sales on executions ; and the chancellor, in his 139th rule, has referred to the statute regulating these sales, to govern the master as to the time and manner of giving notice in the country.   I am aware that these officers usually follow the directions of the plaintiff or his solicitor in this respect, and their interest perhaps may lead them to do so, as they are usually selected by the parties ; but there is nothing in the nature of the office, or the duties belonging to it, which puts them under the control of the parties.   The interposition of an officer to sell the property of defendants at auction would be a useless ceremony, if the officer was to be under the dictation of the plaintiff.   If the master is not only independent of the party, but bound to execute the functions of his office, I should like to know upon what principle the bid of a party, or his solicitor, can be at all sustained.   The party would be substantially both auctioneer and bidder.

I do not intend to say, that the master designedly misled the agent and parties interested in the sale, but I am entirely satisfied such was the natural tendency and effect of his conduct.   I have shown the independent power possessed by masters over these sales, and it must be conceded that such power should be executed in a frank and undisguided manner. Knowing a master to be invested with the control of a sale, it is natural and of course that whatever he may say or do in reference to a pending sale will make a corresponding impres-

ALBANY,
Dec. 1834.

Collier
v.
Whipple.

sion.  Persons who have their all at stake may from abundant caution attend, even against their convictions that a sale will not take place ; but others not so deeply interested will not take the trouble to attend upon contingencies.  It cannot be tolerated that a master shall, in answer to inquiries, express doubts as to whether a sale will take place, and that down to the very moment of sale, and then silently attend and sacrifice the property of parties.  If any cause exists to make it really doubtful whether the sale will take place, and the master is thus obliged to hold the language imputed to him in this case, it is his duty to postpone or undeceive those who have been misled.  He has the power to do so, and justice to all demands its exercise.  If the language of the master had been held on a different day or different hour from that of the sale, we might have been disposed to attribute the non-attendance of those concerned to their negligence ; we might have required more vigilance and sharp sightedness on their part.  But when such language is held at the hour of sale, and within a stone's throw of the place, it could not have been reasonably anticipated that the master's doubts would be cleared up, and the sale completed in some twenty minutes afterwards.  Parties interested in the sale ought not to be required to distrust the motives of the master, or to act as if they were to be entrapped.

Upon the whole, if we believe the statement of the agent, that the master promised to give him notice when the property would be sold, and we have his positive testimony of this fact against the master's mere want of recollection, then the conclusion is plain that the agent was misled and surprised by the conduct of the officer.  The application of familiar rules of evidence necessarily leads to the belief, that the agent was misled ; for it is more probable that the master should have forgotten the fact, than that the agent should have recollected it, if it had no existence.  A witness may innocently forget, but it requires more charity to believe that he can innocently remember what never had existence ; hence the difference in the weight of *positive* over *negative* testimony.

Again, if we believe the master's language and conduct were such as to leave the impression upon the agent, that the sale would be postponed, the conclusion of surprise is inevitable. And we have the positive evidence of three witnesses to this effect, against that of the officer, that he did not intend, and in his belief did not use language that warranted it.

Now, although the language attributed to the master may not have fairly justified the impression made upon these persons, yet we all know, from our observation and experience that impressions and opinions are oft times honestly received and entertained without our being able to account for them in detail ; but the fact of their existence is not thereby weakened. These persons do not undertake to relate all that was said and done ; but they state unqualifiedly that they received the impression from the master that the sale would be postponed. The fact that all three received the impression, is some evidence that it was not without cause or reason, and affords a justification to the agent. Again, if we believe, from the master's own account of the transaction, that his language and conduct throughout was not characterized by that frankness and prudence demanded of him in the discharge of his duty ; that the natural tendency of his language and conduct was to mislead and surprise those desirous of attending the sale ; and that he is not to be justified in holding at the hour of sale equivocal language and then suddenly and silently sacrificing the property—the then bid should be opened.

The principle involved is one of considerable magnitude, and acquires increased interest from the frequency and generality of its operation. We are not laying down a rule merely for this particular case, but one which will be the guide, not only of all these officers, but of every officer whose duty it is to sell the property of the unfortunate at public auction. When we take into view the vast amount of property thus situated ; the numerous sales ; the deep interest felt and at stake, both as regards parties and creditors ; together with the unscrupulous spirit of speculation—the tribunals holding a superintending control over these sales, are admonished to watch with suspicion, and censure with firmness, the least departure from fairness in conducting them.

Without pursuing the examination further, I cannot avoid the conclusion that the case is brought clearly within *White* v. *Wilson*, decided by Lord Eldon, and *Williamson* v. *Dale*, by Chancellor Kent; in neither of which cases were the facts inducing surprise as striking and marked, as those relied on here; and in the latter, it was confessedly unintentional. That the agent was misled by the master, is established by the oath of three unimpeached, and I may add, uncontradicted witnesses; and that, if informed by the master that the sale would be postponed, the agent had a right to confide in the information, is clear from the absolute control of the officer over the sale for the time being. That the *respondent* has been deprived of his rights and lost the fruits or all his perseverance and expense to protect them, if the bid is not opened, is not denied; and that it can be opened without harm to any one, save the loss of a speculation, is absolutely certain.

I am, therefore, in favor of affirming the order of the court below.

By Mr. Senator MAISON. There is no pretence, allowing that Murdock was in point of fact deceived, that the appellant in any manner contributed to the deception, or that he is to be considered in any other light than as a *bona fide* purchaser.

The master is an officer of the court of chancery, and is peculiarly subject to its order and control; and it is as well within the power as it is the duty of the court, in the furtherance of justice and the protection of the rights of parties, to correct any evils which result from the misconduct of that officer. The court has also a power over the purchaser, to which it is considered he submits, by becoming a bidder for premises sold by the order of the court. If after he make the purchase, he becomes insolvent or unable to pay, the court have the power of rescinding the sale, and of ordering a resale; if, however, he be able to pay and will not, the court, at the instance of the party interested, will compel the purchaser to a performance, by process of attachment for contempt. Such power is claimed and exercised by the court of chancery, both in England and in this country; and it is meet and proper

that it should exist in the court. *Cunningham* v. *Williams*,2 *Anstr.* 344. *Lansdown* v. *Elderton*, 14 *Vesey*, 512. *Anderson* v. *Foulke*, v. 2 *Harr.* & *Gills' Md. R.* 346. *Brasher's Ex'rs* v. *Cortlandt*, 2 *Johns. Ch. R.* 506. So also have the courts exercised a control over the purchaser, in withholding from him the object of his purchase, as well before as after he had received a deed for the lands purchased, and as well after as before a confirmation of the sale. The exercise of this power has, however, been long considered of doubtful utility, and is latterly resorted to only in extreme cases.

It has been held, that where a master disobeys express instructions given him in relation to the sale, and the purchaser, fully apprised of those instructions, pays the purchase money and accepts his deed, as where the master was directed not to sell for less than $2600, yet sold for $1000, the sale should not stand—and a resale was ordered, and the first purchaser directed to reconvey. *Requa* v. *Rea*, 2 *Paige*, 339. This case is cited as authoritative or justificatory of an interference in setting aside this sale; the analogy between the two cases is not very apparent.

[The learned senator here adverts to the facts submitted to the chancellor on the petition for a resale, and states his conviction that there is no foundation for the complaint of *surprise*, or that the agent of the judgment creditors had been misled—and then proceeds as follows :]

But it is said an increased bid is offered, and this is used as a reason why the sale should be opened, and some English cases are cited as sanctioning the practice contended for by the respondent. The course of practice adopted in the English chancery, in relation to sales by masters, is materially different from the practice adopted in this state ; the end sought by both modes is the same, to wit, the obtaining the highest possible price for the lands sold. The English mode of selling, is more favorable than ours to the opening of sales ; there the sale partakes of the character of a private bargain, as thus—after the publication of the proper notices in the Gazette, the master in his office opens his book in which is described the property offered for sale, and to which every bidder signs his name,

Vol. XIII.  30

affixing the sum he offers; the person offering the highest amount, on the closing the biddings is declared to be the purchaser, and is so reported by the master; if the sale is confirmed by the court, the title is examined and a conveyance is prepared; the sale is not considered complete until the final settlement of the title, and the coming in of the master's report in relation thereto; until which time, applications, on the ground of an offer of an advance upon the highest bidder, are frequently made for the opening of the biddings—which means no more nor less than a suspension of the sale and a continuance of the property in market. No inconvenience can result from this practice, however doubtful its policy may be, as every bidder knows he is subject to be overbid until the confirmation of the sale. With us, the master, upon receipt of the chancellor's order for sale, gives notice of the time and place of sale, with a brief description of the premises offered to be sold, for six weeks previous to the time of sale, by a weekly publication thereof in a newspaper published in the county where the lands or a greater part thereof are situated, and where they must be sold; three copies of the advertisement are posted up in so many of the most public places in the town where the lands lie; and if the sale be in a different town in the same county, three other copies are posted up in so many of the most public places in that town. The requirement of this publicity of notice, is with a view of notifying every person who may wish to become a purchaser, and of estopping all from alleging surprise or ignorance of the time and place of sale; thus removing a frequent ground of complaint as to want of notice. Every person is holden to know the time and place of sale. On the day of sale, the master, or some other person under his direction, he being present, offers the premises for sale at public auction, and he to whom the property is struck off, as the highest bidder, is the purchaser. Upon the falling of the hammer, if the decree of sale be enrolled, the master may immediately execute and deliver the deed; but the sale is not considered as complete until a confirmation of the master's report of the sale, which will be after eight days from the entry of the order confirming the sale. I know of no instance in this state where, after the sale of the master

has been confirmed, it has been set aside and a resale ordered *merely to let in an advanced bid*, and for no other cause. If any such case has occurred, it has been or should have been only upon the person's offering the advanced bid, becoming bound that he would make such advanced bid, should the sale be opened, or making what should under the circumstances be considered an adequate deposit. There is no evidence in this case that an increased bid has been offered, by which the bidder would be bound; and so the chancellor considers it as he has directed, that unless the proposed increased bid be made, the original sale shall be confirmed. Nor is there any evidence that a deposit has been offered, made or required. It no where appears in the papers submitted, that an advanced bid would be offered, except by the petition of the respondent, in which it is stated that the respondent was informed and believes that B. Knower authorized S. Cheever, Esq. to authorize him, the respondent, to bid for lot No. 13 the sum of $3500, which is about $1100 more than the appellant bid, and that B. Knower was still willing to bid that sum for the lot. This is not to my mind satisfactory evidence that Knower was at all bound to make this increased bid, should the sale be opened, for it may be that Murdock had been misinformed; and it is not a little extraordinary that there is no evidence in the case, from Knower himself, in this particular. The petition of the respondent was drawn up and sworn to in the city of Albany, the place of residence of Mr. Knower, as appears by the papers, and no reason is given for the absence of such evidence. It is true, it appears from the affidavit of Murdock, who lives in the county of Broome, which was also sworn to in the city of Albany, that he had received instructions from S. Cheever, to bid, &c., yet there is no evidence from Mr. Cheever, who also resides in the city of Albany, as appears from the papers, that he was ever authorized by Mr. Knower to give such instructions to Murdock, or any one else. This is too vague, uncertain and unsatisfactory, if not suspicious, to justify any judicial action upon the allegation as a fact that an advanced bid had been offered. But if that fact had been fully established, it does not appear that the advancing bidder had sub-

jected himself to the jurisdiction of the court in this respect, so that a compliance with the offer could be enforced. It does not comport with my views of sound policy or justice, that the powers of the court should be speculated upon, to subserve individual interest, or that *bona fide* purchasers of lands sold in virtue of its power and directions, should be hindered or delayed in the improvement or other disposition of the lands purchased, to await the uncertain contingency of an increased bid, by which they may or may not be deprived of the object of their purchase. The English courts will not open biddings at a master's sale, even where the sale has not been confirmed or deeds executed, without a deposit of a reasonable advance on the bid, together with the payment of the purchaser's expenses. *Rigby* v. *M'Namara*, 6 *Vesey*, 466. Lord Eldon remarking, in the same volume, page 513, the deposit is the only hold the court has upon the purchaser. *See also Earl of Macclesfield* v. *Blake*, 8 *Vesey*, 214. *Trefairs* v. *Clinton*, 1 *Vesey & Beame*, 361.

If, however, there had been an increased bid offered, by which the bidder would be bound, either by a stipulation in writing or by a deposit of a reasonable advance on the bid, I do not think this sale should be opened because of the amount offered. Collier had disposed of one of the lots to Whitney, and notice of the application to set aside the sale was not served until on or after the 18th July; the order confirming the master's report of the sale having became absolute on the 9th of that month. It is true Collier was on the 28th June notified that as soon as papers could be prepared, an application would be made to set aside the sale; but was he bound by such notice? Should he be compelled by reason of such notification to remain in *statu quo* a week, a month, or a year? It cannot be pretended. Notice of a motion to set aside the sale should have been served before the order confirming the sale had become absolute; this must have been the intent of the eight day rule of confirmation. If the party interested will permit the eight days to expire without taking any measures to set aside the sale, he must be held concluded, unless there is some fraud or misconduct in the individual who has the benefit of that confirmation, or a fraudulent negligence in an-

other person as the agent, of which it is against conscience that the purchaser should take advantage, which is not pretended in this case. Such is the course of the English courts, *Morrice* v. *Bishop of Durham*, 11 *Vesey*, 57, *White* v. *Wilson*, 14 *id*. 151, and such should be the course of the court here. Acting upon the reasonableness of this rule, Ch. Kent, in the case of *Lansing* v. *M'Pherson*. 3 *Johns. Ch. R.* 424, where the deed had not been delivered, nor the master's report of the sale confirmed, ordered a resale, saying : "I think the sale can be opened without any inconvenience or injury in this case and justice would seem to require it, especially in favor of a defendant who offers to give 50 per cent. in advance of the purchase money, and who is bound to supply the remainder of this debt, unsatisfied by the sale ;" and it was ordered, on condition that the defendant deposit with the register, within eight days, an advance of 50 per cent. on the sum bid by the plaintiff, and on his paying the plaintiff the expense incurred at the former sale. So also in the case of *Williamson* v. *Dale* 3 *Johns. Ch. R.* 290, where the master's report of the sale had not been made, nor had a deed been executed to the purchaser, a resale was ordered. The premises had been bid off at $2700, subject to a prior mortgage of the same amount, and the petitioners stated the value of the property to be more than $12,000. The application for a resale was on the ground of surprise, and the small amount produced by the sale in comparison with the value of the premises ; the defendants were innocently misled, and induced to believe, from the representations of the complainant and his solicitor, that the sale would not take place on the day advertised. Ch. Kent said " I wish it to be distinctly understood that I interfere in this case on the ground of *surprise*, and that I do not lay any stress upon the alleged inadequacy of the auction price ; such a ground alone, unattended with other circumstances, is not sufficient."

In *Duncan* v. *Dodd*, 2 *Paige*, 101, Ch. Walworth deprecated, with the English chancellors, the practice of opening the biddings at master's sales, as tending to shake public confidence in the safety af such proceedings. After stating that Lord Eldon had said, that he had heard, during a period of

nearly half a century which he had passed in that court, Lord Apsely, Lord Thurlow, the Lords commissioners, with Lord Loughborough at their their head, then Lord Loughborough as chancellor, and after him the lords commissioners with Chief Baron Eyre at their head, one and all, lament that the practice of opening bidding was ever introduced—adds: "If such are the opinions of English chancellors as to the dangerous tendency of the practice in that country, where real estate has comparatively a fixed and certain value, a resale ought not to be granted here except in very special cases. In the city of New-York, real estate, when sold by a master under a decree or order of this court, generally produces its fair value. It is therefore essential to the interests of those whose property is thus sold, that purchasers should continue to retain full confidence in the safety of such purchases, and that they will not, as a matter of course, be disturbed merely because a good bargain has been obtained." In *Duncan* v. *Dodd*, the premises were struck off for $2025, no conveyance having been executed, and the petitioner offering an advance of 50 per cent. on the purchase, for the benefit of infant defendants, the chancellor ordered a resale, upon sufficient surety to the satisfaction of the master that the premises should actually produce 50 per cent. advance upon a resale, or a deposit with the master of the advance offered; and this upon the ground that the property sold was the sole dependence of two infant children, and was sacrificed either through the misapprehension or negligence of their mother and step-father. The chancellor expressly stating that "if the defendants were adults, and the property had been sacrificed by their own negligence or inattention, he would not disturb the sale.

Great oppression and injustice oft times grows out of the opening of these sales, and if these applications are to be listened to, a sacrifice of the property must be the necessary consequence, as bidders will calculate the hazard of the sale being set aside, and the costs, delay and vexation consequent to a resistance of the application. Lord Eldon, in the case of *White* v. *Wilson*, before cited, remarked, that half the estates that were sold in that court, had been thrown away upon the speculation that there will be an opportunity of purchasing afterwards by opening

ALBANY,
Dec. 1834.

Collier
v.
Whipple.

biddings. It was well observed by Ch. Dessaussure, in *Gordon* v. *Sims,* 2 *M'Cord's Ch. R.* 158, that it is not the course of the court in this county to open biddings on the ground of too high or too low a price. The court looks to the sale, and if it be regularly conducted and fairly made, considers it obligatory on both parties. I am for reversing the chancellor's decree, with costs to the appellant in this court and in the court of chancery, to be paid by the respondent. The chancellor, in the decree appealed from, reserved the question of costs, but I have no doubt of the power of this court under the statute, 2 *R. S.* 167, § 27, to make an order in relation to the costs in both courts, where, as in this instance, the whole case is before this court.

Upon the question being put, *Shall this decree be reversed?* the court divided as follows :

In the *affirmative*—Senators Armstrong, Cropsey, Griffin, Lansing, Maison, Seger, Stower and Tracy—8.

In the *negative*—Chief Justice Savage, Mr. Justice Sutherland, Mr. Justice Nelson, Senators Conklin, Dodge, Gansevoort, Halsey, Lynde, Mac Donald, Mack, and Van Schaick—11.

Whereupon the decree of the chancellor ordering a resale was *affirmed.*