## KELLOGG vs. HOWELL and others.

Where a party, by motion, seeks relief from a sale of mortgaged premises made by a referee, upon the assumption that a regular judgment existed, under which the referee was duly appointed, and that he had given the requisite and usual notice of sale, and proceeded to offer the premises, thereunder, and executed his deed in pursuance of the sale so made by him, no question as to technical or formal irregularities, required by rule 46 to be specified in a notice of motion, arises, and the rule does not apply.

Any person whose rights are injuriously affected by a judgment, or a sale of property under it, may move to set aside the same, although he is not a party to the suit.

Thus where O. paid $1410 for the equity of redemption in mortgaged premises sold under the direction of assignees in bankruptcy, and took a nominal title to E., who subsequently conveyed all his right, title and interest in the premises, to O., for whom he was a mere trustee; *Held* that O. had such a standing, as to the equity of redemption, as would enable him to invoke the equitable power of the court over a judgment of foreclosure and a subsequent sale thereunder; and, if a proper case was shown, entitle him to have the foreclosure sale set aside, and a resale ordered.

No action will lie to set aside a sale of property of the judgment debtor under a judgment. The only remedy is by motion to set aside the judgment.

Resales are ordered upon less evidence of fraud, surprise, accident, or misconduct of the officer making the sale, where the plaintiff or mortgagee is the purchaser, and the rights of third parties, or *bona fide* purchasers have not intervened, than when a stranger to the suit is the purchaser.

A sale under a judgment will not be set aside, in the absence of fraud, surprise, or well grounded misapprehension, simply because a higher price can be reasonably anticipated on a resale of the premises.

Where, prior to a sale of mortgaged premises, under a judgment of foreclosure, the plaintiff and his attorney were aware that E. had become the purchaser of the equity of redemption, and that he was intending to pay off the plaintiff's claims, or protect himself by an amicable arrangement with the plaintiff, and thus avoid a sale on the judgment; and on the day of the sale, the plaintiff was informed that O. was interested in the premises, and that a *bona fide* effort was being made by him either to obtain an assignment of the judgment or to pay the same; or to attend the sale and bid in the premises; but the sale was finally made, in the presence of only a few persons, and the property bid off by the plaintiff, without any effort to notify E. or O. that the sale was about to take place, or in what part of the house it was to be made; and their agent, who went to the house designated, for the purpose of attending the sale, did not know that the sale was going on; *Held* that this was a proper case for setting aside the sale, and granting a resale, on the execution of a bond to the plaintiff to secure the amount of his bid.

Kellogg *v.* Howell.

THIS action was brought to foreclose a mortgage held by the plaintiff, executed by the defendant Howell, upon which a decree of foreclosure was entered, and sale advertised by the sheriff of Lewis county, as referee, to take place on the 20th of January, 1872, "at Howell's Hotel, in the village of Lowville, at 10 o'clock A. M." On that day, as claimed by the plaintiff, the premises were sold by the sheriff, as referee, at public auction, and were struck off to the plaintiff for $2701.64, he being the highest bidder. On the 23d of August, 1871, the defendant Howell was adjudged a bankrupt, on the petition of his creditors, and on the 21st of November, 1871, an order was made in the U. S. district court authorizing Rufus L. Rogers and Lewis A. Scott, assignees, to sell the said mortgaged premises, subject to the liens thereon. They advertised and sold them, at auction, on the 19th of January, 1872. Ralph Glasgow attended the sale, and bid them off for $1410. They were conveyed, by his direction, by the assignees, to Russell J. Easton. Said Easton, by his deed, bearing date February, 1872, conveyed the premises to John O'Donnel, who furnished the money to pay, and was the real party making the purchase at the assignees' sale.

On the 13th day of February, at the Onondaga special term, a motion was made, in behalf of O'Donnel, to set aside the mortgage sale of the 20th of January, and was "denied without prejudice to Russell J. Easton renewing the same, or of his assignee to renew it; that said renewal motion may be made for the March special term to be held at Watertown."

The motion is made on behalf of O'Donnel, to set aside or open the sale, made the 20th of January, of the mortgaged premises, and numerous affidavits are presented.

It was admitted on the argument that no order had been obtained confirming the sale. On the argument an offer to bid the amount of the plaintiff's mortgage and costs

was made, and to give a bond to that effect, in case a resale should be ordered.

*Abram I. Mereness* and *Henry A. Foster*, for the motion.

*Cornelius E. Stephens*, opposed.

HARDIN, J. When this motion was opened, several preliminary objections were made, to wit:

1. That the notice of motion did not specify any irregularity complained of.

2. That the moving party had no title to the premises.

3. That the grant from Easton to the moving party was void.

4. That the moving party, by furnishing the money to Easton, and by taking a deed from him, derived no right or equity authorizing him to make this motion.

5. That Easton had no cause of action, or right, to assign.

6. That Easton did not propose to assign his right to make this motion, but merely conveyed his interest in the premises.

Having reserved the decision of the questions raised preliminarily, they will now be considered and passed upon. The first objection is predicated upon the requirements of rule 46; but as this motion seeks relief from the sale made by the referee, upon the assumption that a regular judgment existed, in which he was duly appointed, and that he had given the requisite and usual notice of sale, and proceeded to offer the premises thereunder, and executed his deed in pursuance of the sale so made by him, no question as to technical or formal irregularities referred to in the standing rule arises, and the rule does not apply to this motion.

The second objection assumes that the moving party has no title to the premises. This, of course, depends upon

the effect which shall be given to the sale had in pursuance of the judgment herein. It must be obvious that if the sale is set aside, then the deed of Easton to O'Donnel is effectual for the purpose of vesting in him the equity of redemption.

The third objection is untenable, for the assumption is erroneous in so far as it rests upon the idea that the title and possession supposed to be held by Kellogg, under the sale and purchase, is adverse to that taken by Easton from the assignees. Both are derived from Howell, and section 147 of 1 Revised Statutes, page 690, (Edmonds' ed.,) is inapplicable. (22 *N. Y.* 170. 39 *Barb.* 513.)

It may be observed, as to the remaining objections, that the moving papers clearly establish that the $1410 paid for the equity of redemption purchased at the assigneee's sale, on the 19th of January, was furnished by the party now asking the equitable power of the court, and that he has since acquired all the interest and title of Easton, and stands in his shoes, with respect to the title, and that if the sale is allowed to stand, he is the party to suffer. It is true that he is not the owner of a cause of action by assignment, which would enable him to maintain an action to set aside the sale and conveyance to the plaintiff, it being well settled that a remedy by action does not exist. (*Gould* v. *Mortimer*, 26 *How. Pr.* 167 ; 30 *N. Y.* 80.)

In *Gould* v. *Mortimer*, (*supra*,) Judge Mullin uses language which so pertinently applies to the objections now under consideration, that it is not inappropriate to quote the same. He says: "Every person whose rights are injuriously affected by the judgment, or proceedings under it, has the right to move the court to set aside or amend them, although he is not a party to the suit." Subsequent judgment creditors have been allowed, repeatedly, to vacate prior judgments that were fraudulent. (*Chappel* v. *Chappel*, 2 *Kern.* 216.) In this case Judge Dean, at page 222, asserts, "that the court has control over its own

judgments, and may, on motion, for cause shown, set them aside." (15 *How.* 67.) And judgment creditors have been allowed to set aside mortgage foreclosure sales, although not parties to the suit. In *American Insurance Company* v. *Oakley*, (9 *Paige*, 259,) there were several judgments against the premises, and the parties who sought to set aside the sale and obtain a resale had redeemed the premises from a prior judgment sale on executions, and thereby became entitled to the rights of the purchaser in the surplus moneys upon the mortgage sale, after paying the complainant's debt and costs, and the chancellor ordered the sale to be set aside.

The conclusion reached upon the preliminary objections is, that they must be overruled, and that the moving party having paid $1410 for the equity of redemption in the premises sold under the judgment herein, and having taken a nominal title to Easton from the assignee, and Easton having conveyed all his right, title and interest in the premises before this motion was made, and having, by his affidavit, declared that he was trustee for O'Donnel, the moving party has such a standing, as to the equity of redemption, as will enable him to invoke the equitable power of the court over the judgment and sale herein; and if a proper case is made, within the settled principles applicable to it, is entitled to have the sale set aside and a resale ordered, on such terms as shall be just and proper.

The referee appointed to make the foreclosure sale advertised the same to take place at the " Howell House, on the 20th of January, at 10 A. M.," and between the hours of 10 and 11 A. M. of that day appeared in the office, which is situated in front of the bar-room, and separated therefrom only by an archway, and engaged with numerous other persons in the biddings there taking place as to some accounts being sold; and as such sale was about concluded, and about twenty minutes before 11 o'clock, passed from the office into a hall of about 16 feet in width, and thence across

Kellogg *v.* Howell.

the hall into a reading room or sample room, situated on the same floor as the office, and fronting upon the same street as the office, and there, in the presence of some seven persons, concluded the sale of the mortgaged premises.

There is a contrariety of evidence before the court as to the hour at which the sale was concluded, some of the witnesses fixing the time a few minutes before, some exactly 11 A. M., and some a few minutes after 11 o'clock; but, in the view entertained by the court, it is not necessary to determine the precise time of the conclusion of the sale.

It appears, in the papers submitted, that as soon as the premises were struck down, a pen and ink were sent for, and a Notary Public. Then the attorney obtaining the judgment and conducting the sale, filled in the name of the purchaser, and the sum bidden, and the acknowledgment was taken, and the referee's deed was completed and delivered to the plaintiff, and by him put on record at 11.30 A. M. in the county clerk's office.

After the purchase by Easton, at the assignees' sale on the 19th of January, and in the evening of that day, at the store of the plaintiff, an interview was had between him and Easton, and the latter inquired as to the amount of the plaintiff's liens upon the premises, and was informed that there were two mortgages prior to the one in suit, held by the plaintiff, and that there was upwards of $11,000 over due on these mortgages. Some surprise was expressed by Easton that so much was past due, and some further conversation took place; but as the affidavits are in conflict in respect thereto, I shall not stop to draw any further deductions therefrom.

The next morning a conversation took place, about 7.30 A. M., in the office of the attorney conducting this suit, in respect to the sale advertised for that day, in which was discussed the subject of Easton's right to pay and stop the

proceedings, and that conversation was participated in by the plaintiff, his attorney and Easton, and no definite conclusion was then arrived at as to the course that should be pursued. Subsequently, and about 10 A. M., an interview was had between the plaintiff and Mr. O'Donnel, in which the fact that the latter was interested in the premises and the purchase thereof by Easton, was disclosed to the plaintiff, and the course to be pursued in respect to the plaintiff's liens was spoken of, but no definite conclusion settled upon ; and in respect to this interview there is some conflict in the affidavits read upon this motion.

At the instance of O'Donnel, and under his instructions, Ralph Glasgow went into the office of the Howell House, to be present at any sale that might take place, and bid them off in case of the sale of the mortgaged premises. When he reached the office he found the accounts before alluded to were being sold; and he remained in the office. While there he inquired of the referee if a sale of the mortgaged premises would take place that day. His affidavit states that he was told by the referee "he did not know yet;" and his affidavit further states that he was diligently listening, but did not hear any notice or announcement of said sale made by any person, and *did not know when the same took place* * * and waiting to hear the referee announce said sale if it was to take place ;" and that he was, while waiting, informed said sale had taken place. He then went into the reading room and informed the referee that he was prepared to bid on said property, and was "there for that purpose." In behalf of the moving party numerous affidavits are read of persons in the office and bar-room, to the effect that they did not hear the referee give notice of his intention to sell the premises, before leaving the office and crossing through the hall into the reading room. In behalf of the plaintiff numerous affidavits, including that of the referee, were read, stating that they heard the referee at the time of

Kellogg *v.* Howell.

leaving the office, say that he would now proceed to sell the premises, or open the other sale, or sell the hotel, or that in substance; and also the affidavits of quite a number of persons who state that they heard the referee, after reaching the reading room, read in a clear, loud and distinct voice the printed notice of sale, open the sale and cry the premises, and the bid made by the plaintiff's attorney of $2701.64, several times, distinctly. Some of these persons were in the reading room, some in the hall, some on the second floor, and some on the third floor over the reading room, and one in the plaintiff's store, next adjoining the reading room; and were it important to determine, upon this motion, whether the referee announced the sale before leaving the office, or whether he read the notice of sale in the reading room, or whether he called audibly the bid so made, and struck off the premises to the plaintiff on the bid of his attorney, there would be little difficulty in reaching the conclusion that the referee has given the version which is substantially in accordance with the facts.

It appears in the affidavits of the attorney of the plaintiff that while said sale was taking place, " he looked at his watch several times as it approached eleven o'clock, and urged the referee to close the sale " * *; and " that just previous to striking off, the deponent looked at his watch, found it was precisely eleven o'clock by the deponents watch, and informed said sheriff that it was eleven o'clock by deponent's time, and that deponent was four or five minutes too *slow* by railroad time, and told said sheriff that the hour had passed, no one else had bid, and deponent thought that Kellogg had a right to his bid, and to his deed, which deponent then produced ready for signature, except filling in the amount bid, and name of purchaser."

The moving papers also disclose that the amount of the bid, $2701.64, was tendered to the plaintiff subsequent to the sale, and that he refused to receive the same, and the

amount tendered was left in the hands of Scott, and on the argument the party making the motion offered to give a bond conditioned to bid the amount of the plaintiff's debt and costs, in case a resale should be ordered.

The only remedy the moving party has, upon which he can rely, is this motion ; and unless he can obtain relief · upon the principles that are applicable on such motions, he must lose his $1410, and the plaintiff be permitted to gain to that extent by the sale; for, as before shown, the authorities are settled that no action can be maintained to set aside the sale. (*Requa* v. *Rea*, 2 *Paige*, 339. *Collier* v. *Whipple*, 13 *Wend.* 224. *Nicholl* v. *Nicholl*, 8 *Paige*, 349. *Am. Ins. Co.* v. *Oakley*, 9 *id.* 259. *Brown* v. *Frost*, 10 *id.* 243. *Gould* v. *Mortimer*, 26 *How.* 167. *McCotter* v. *Jay*, 30 *N. Y.* 80.) In approaching the questions made, as to the right of the moving party to open the biddings and have a resale, it may be observed, that a sale is not held as conclusive. Resales are ordered upon less evidence of fraud, surprise, accident or misconduct of the officer making the sale, when the plaintiff or mortgagee is the purchaser and the rights of third parties or *bona fide* purchasers have not intervened. In *Tripp* v. *Cook*, (26 *Wend.* 145,) the chancellor says: " Where the mortgagee or complainant himself becomes the purchaser, the court has not always held the sale so conclusive as when the property has been purchased by one who was an entire stranger to the suit, who had bid for the purpose of investment merely." In the same case, page 155, Senator Verplanck uses the following language : " The mortgagor, and *those who stand in his place*, and share in his losses, have a right to be protected, so far as is consistent with the mortgagee's rights, against needless sacrifice of their property, whilst the mortgagee can claim nothing beyond the amount of his loan." And at page 158 he adds : " When the buyer is the holder of the mortgage, he must surely be content if his debt is paid. He has, commonly, an entire

control over the proceedings and sale, and has no right to use it for any purpose or advantage beyond securing himself. Nor does the holder stand on the same footing of public policy with other buyers. He seldom purchases for investment or use." In this case, Mr. Kellogg was the mortgagee and plaintiff, and had also two prior mortgages upon the premises; and if a resale shall be ordered, and the required bond executed to him, of the character of the one tendered, it is difficult to see how he can lose his debt and costs, or be deprived of anything except the fruits of a speculation which he might reap, in case the purchase made by him should be allowed to stand.

However desirable that point may be to him, it cannot have any influence in preventing an order for a resale, provided this case comes within the established rules of equity applicable under the numerous authorities in this State.

Among the many authorities cited by the learned counsel who opposes this motion, is *Whitbeck* v. *Rowe*, (25 *How. Pr.* 403;) and in the opinion of Justice Hogeboom, (*p.* 407,) the general rules applicable to applications to set aside sales, are very well stated. It is there said that "we have no rule of equity which permits us to set aside a sale in the absence of fraud, surprise, or well grounded misapprehension, simply because a higher price can be reasonably anticipated on a resale of the premises."

The general proposition there stated has been repeatedly held in the courts of this State, and less laxity in setting aside sales here has existed than in England.

In *Livingston* v. *Byrne*, (11 *John.* 565,) Yates, J., took occasion to say, that "a sale made at auction, and under process of law, ought not to be invalidated for mere inadequacy of price, *without additional* circumstances to justify it;" and in applying that rule to the case then under consideration, took occasion to say, that "there is no part of the respondents conduct which will warrant the suspicion

of unfairness." Four years thereafter, and now more than fifty years since, Chancellor Kent, in *Williamson* v. *Dale*, (3 *John. Ch.* 291,) following *Livingston* v. *Byrne*, set aside a sale, and took occasion to say: "I wish it to be distinctly understood, that I interfere in this case on the ground of surprise, and that I do not lay any stress upon the alleged inadequacy of the auction price." And he further said: "I may add, further, that the surprise here is not of the most striking kind, and the case for relief on that ground is pushed to the utmost verge of an admissible interference." In that case there was no imputation of unfair intention in the plaintiff or the solicitor, or of any unfair conduct at the sale, but the defendant was innocently misled, and for that reason the sale was opened.

Some of the facts upon which an application was made to open the bids, and for a resale, in *Collier* v. *Whipple*, (13 *Wend.* 225,) are somewhat similar to some of those relied upon in this case. The motion was resisted by the purchaser, who disclaimed all collusion in the matter, and the master made an affidavit stating that the proceedings, on his part, were in good faith, explaining the circumstances of his interview with the agent on the morning of the day of the sale, but admitting that he stated he did not know whether he would adjourn the sale or not. In the very elaborate and pointed opinion delivered by Judge Nelson, he says: "It cannot be tolerated that a master shall, in answer to inquiries, express doubts as to whether a sale will take place, and that down to the very moment of sale, and then silently attend and sacrifice the property of parties. If any cause exists to make it really doubtful whether the sale will take place, and the master is thus obliged to hold the language imputed to him in this case, it is his duty to *postpone*, or undeceive those who have been misled. He has the power to do so, and justice to all demands its exercise. If the language of the master

Kellogg *v.* Howell.

had been held on a different day or different hour from that of the sale, we might have been disposed to attribute the non-attendance of those concerned to their negligence. He might have required more vigilance and sharp-sightedness on their part. But when such language is held at the hour of sale, and within a stone's throw of the place, it could not have been reasonably anticipated that the master's doubts would be cleared up, and the sale completed in some twenty minutes afterwards. Parties interested in the sale ought not to be required to distrust the motives of the master, or to act as if they were to be entrapped."

The doctrine of the opinion, from which the quotation just given is taken, has recently been examined and approved by the Court of Appeals, in *King* v. *Platt*, (37 *N. Y.* 160.) It is there said by Judge Fullerton, that " a court of equity justly scrutinizes the conduct of a party, placed by the law in a position where he possesses the power to sacrifice the interests of another, in a manner which may defy detection, and stand ready to afford relief on very slight evidence of unfair dealings, whether it is made necessary by moral turpitude, or only by a mistaken estimate of others' rights. Occupying the position of advantage it behooved the plaintiffs to pursue their remedy with scrupulous care, lest they should inflict an injury on one who was comparatively powerless.

In addition to the cases already cited, the principles upon which the case now under consideration turns, have been discussed and applied in numerous authorities, and they assert a doctrine in harmony with those already referred to. (*See* 10 *Bosw.* 587 ; 2.*Daniels' Ch. Pr.* 1291, *and note, ed. of* 1871; 12 *How. Pr.* 479 ; 13 *id.* 555 ; 24 *id.* 440 ; 5 *Abb.* 350 ; 22 *Barb.* 167 ; 9 *Abb.* 283.)

The conclusion cannot be resisted, after a careful perusal of the affidavits read upon this motion, that on the

19th of January the plaintiff and his attorney were aware that Easton had become ·the purchaser of the equity of redemption, for the sum of $1410, and that he was intending to pay off the plaintiff's claims, or protect himself by an amicable arrangement with the plaintiff, and thus avoid a sale on the judgment herein; that on the 20th of January the plaintiff was informed that O'Donnel was interested therein, and that a *bona fide* effort was being made either to obtain an assignment of the judgment in this action or to pay the same; or, in default of an amicable adjustment thereof, to attend the sale in person or by an agent, and bid in the premises, for the protection of the interests and rights created by the advance of the $1410, and that some knowledge of the pending negotiations in respect thereto, was possessed by the referee, when the hour for the sale arrived.

When the referee made the sale in the reading room, he had in his immediate presence only some half dozen persons, including the plaintiff, his attorney and the mortgagor, and must have known that no one representing the equity of redemption was present; and that those interested in it, if they knew the sale was taking place, were not following the dictates of self-interest. And he might with great propriety have dispatched a messenger, or held open the sale, for the purpose of assuring himself that persons within a stone's throw, whom he knew were interested in his proceedings, had full and ample information that the sale was then taking place, as well as of the room in which the same was being conducted.

In the language of Judge Harris, in *Powell* v. *Tuttle*, (3 *Comst.* 402,) " greater regard for the interests of those whom he was about to divest of their property, would have been entirely compatible with a faithful discharge of his public trust. * * If the property was to be sold, they were entitled to the surplus moneys, and had a right

Kellogg *v.* Howell.

to a reasonable exertion on the part of the referee to prevent unnecessary sacrifice."

The presence of some fifty persons in the office of the hotel, at the time the referee went therefrom across the hall, into the reading room, and opened the sale; and the absence from the room, where the sale was conducted, of more than seven persons, might well have led the referee to have again returned to the office and there completed his sale, or at least to have distributed the information more generally, that the sale was about to be concluded, in the reading room. Ralph Glasgow, who was instructed to attend the sale, and who swears he attended in the office for that purpose, says, upon his oath, that he did not know the sale was going on, and in short, that he got no information in respect thereto, until it had closed. Had the referee pursued the course above indicated, Glasgow might have pursued the instructions he had received, and if he had not, would have been guilty of culpable negligence. No doubt would then remain as to his "being misled and surprised by the conduct of the officer."

It was prominently shown in the opposing papers, that the sale by the assignees took place in the reading room, but nothing appears to indicate whether, on that day, there were several persons in the office, who had no notice of the sale. But the fact does not appear that the door leading to the street from the reading room was locked both days, and had been left locked for several months. It is true, the advertised notice of the sale under the judgment herein, was "at the Howell Hotel," and the office was the more public place, and was the place where a sale of accounts took place on the same day, and just prior to the foreclosure sale, and presumptively the proper place for conducting the same.

Obviously many persons who entered the hotel for the purpose of attending the sale, supposed it would take

place in the office; yet the motives which led the referee to choose the reading room as the place of sale may have been entirely good, as well as proper.

Had the printed notice indicated the room in which the sale was to take place, many of the circumstances which are relied upon to show that Glasgow, the agent, was surprised, and labored under a well grounded misapprehension, would not have arisen.

When sales are advertised by referees to take place at large hotels, having numerous general rooms, it would be prudent and safer to insert in the notice a specification of the room in which the sale would take place.

It being apparent that no loss of the plaintiff's debt can happen, I think it is the clear duty of the court to set aside the sale, and direct the same referee to cause the premises to be advertised and sold over again, in accordance with the usual course and practice in such cases.

If it had appeared, beyond doubt, that the referee had intentionally and willfully misled Glasgow, the agent, or the parties interested in the equity of redemption, I should direct the appointment of a new referee; but considering all the features of this case, I am not of the opinion that it calls for a change of the referee.

An order will be entered setting aside the sale, but without costs of this motion to either party; provided the moving party shall execute a bond, with sureties, to be approved by a justice of this court or the county judge of Lewis county, in the penalty of $3000, conditioned that on a resale there shall be a *bona fide* bid of $2701.64, and in addition thereto, of a sum sufficient to pay the interest thereon from the 20th of January, 1872, to the day of such resale, and the expenses of such resale; and that the bidder shall, if the property is knocked down to him, then and there complete his bid.

The bond to be given will be in form, substantially, like the one found in 9 *Abbott*, page 285, and the form and suf-

ficiency of sureties may be approved by the said county judge or a justice of this court, and when so approved and filed with the clerk of Lewis, the order for a resale will be effectual. (*a*)

[JEFFERSON SPECIAL TERM, March 19, 1872. *Hardin,* Justice.]

(*a*) Affirmed at a general term in the 4th Department, held at Buffalo, June 4, 1872. Present, *Johnson, Talcott* and *Barker,* Justices.