PETITION OF JOHN SNOOK FOR AUTHORITY TO CHANGE HIS NAME.

Under the "Act to authorize persons to change their names," (Laws 1847, ch. 464), before the judge is entitled to exercise the special jurisdiction thereby conferred, the evidence presented must be such that he can say judicially, that the applicant will derive a pecuniary benefit by assuming another name.

Mere belief of the petitioner that it will be for his pecuniary interest that his name should be changed, is not sufficient to authorize the judge to order the change desired.

The origin of proper names considered, and the law and usage respecting them examined.—Per DALY, F. J.

It seems, that although the custom is universal for all male persons to bear the name of their parents, there is nothing in the law prohibiting a man from taking another name, if he so desires; nor is there any penalty or punishment for so doing.

A contract or obligation may be entered into by a person by any name he may choose to assume. The law only looks to the identity of the individual, and when that is clearly established, the act will be binding upon him.

AT CHAMBERS, *August* 4, 1859.

The applicant petitioned for a change of name under the provisions of the act referred to, passed December 14th, 1847. See 3 R. S. (5th ed.) 873. All the material facts in the petition are stated in the opinion.

*The petitioner*, in person.

DALY, First Judge.—This is an application for an order authorizing the petitioner to change his name to John Pike.

He sets forth in his petition that Snook is a name of German origin, corresponding with the English word Pike. That some years ago he intended to apply to the legislature for liberty to change his name, and consulted a lawyer, who advised him that he had the right to change his name himself, and that such application was not necessary. That he accordingly changed his name to John Pike, and became a member of a firm, in the city of Syracuse, under the name of John Pike & Co., and under that name became and is known to a large number of his business acquaintances, and enjoys under it a business goodwill;

that he contemplates entering into a copartnership with a gentleman of this city who objects to the name of Snook appearing in the business title or name of the firm, and that the petitioner believes it to be for his pecuniary interest that his name should be known as John Pike.

Under the act of 1847 a judge of this court may authorize any person of full age, residing in this state, to assume another name, if the judge is satisfied that the applicant will derive any pecuniary benefit from assuming another name. By this is to be understood that the judge is to be judicially satisfied, upon proper proof (*Smith* v. *Luce*, 13 Wend. 237,) that such will be the effect if the name is changed. To put a case in point, if an estate is left to a man by will, upon condition that he take the name of the testator, then it is apparent that he will derive a pecuniary benefit by being allowed to assume that name. In this case the petitioner merely shows that he believes that it will be for his pecuniary interest that his name should be changed to John Pike; but that, in my judgment, is not sufficient to give me authority, under this act, to order his name to be changed. The mere possibility or probability that such may be the effect is not enough. The evidence before the judge must be such that he can say judicially that the applicant will derive a pecuniary benefit by assuming another name, or a case is not presented that will entitle the officer to exercise the special jurisdiction conferred by the act.

The question has been asked, upon this application, whether he has not the right to translate his name into the English language, and call himself by the word in English, which is equivalent to or of the same meaning as Snook? It does not fall within the sphere of my judicial duty to pass upon that question; but, as this application has been made in good faith, and is very earnestly pressed, I have no objection to state my views. The word Snook is not, as the applicant supposes, of German origin, nor is " pike " expressed in German by such a word. The word is Dutch or Flemish, from *snoek*, signifying pike, a species of fish. Wernick's Dictionary. The meaning of the word con-

stituting the name of a person, is of no importance, for, considered as a name, it derives its whole significance from the fact that it is the mark or *indicia* by which he is known. Many names have no specific meaning apart from indicating the persons who bear them, and; as *designatio personæ*, it makes no difference should the word or name performing that office, as is frequently the case, be also a word for expressing something else. As the proper or lawful names of persons is a subject to which legal writers have paid but little attention, it will be necessary to examine the state of the law respecting it. As I have said, a man's name is the mark or *indicia* by which he is distinguished from other men. By a practice now almost universal among civilized nations, it is composed of his christian or given name, and his surname. The one is the name given to him after birth, or at baptism; the other is the patronymic derived from the common name of his parents. In the case of illegitimates, they take the name or designation they have gained by reputation. *Rex* v. *Smith*, 6 C. & P. 154; *Rex* v. *Clark*, R. & R. C. C. 358. The christian or first name is, in the law, denominated the *proper* name; and a party can have but one, for middle or added names are not regarded. *State* v. *Martin*, 10 Mis. 391; *Edmonston* v. *The State*, 17 Ala. 179; *McKay* v. *Spick*, 8 Texas, 376; *Rex* v. *Newman*, 1 Ld. Ray. 562, 305; *Franklin* v. *Tallmadge*, 5 Johns. R. 64. Formerly, the christian name was the more important of the two. "Special heed," says Coke, "is to be taken of the name of baptism, as a man cannot have two, though he may have divers surnames." Coke Litt. 3, *a* (*m*). Indeed, anciently in England, there was but one name, for surnames did not come into use until the middle of the fourteenth century, and even down to the time of Elizabeth, they were not considered of controlling importance. Thus Chief Justice POPHAM, in *Britton* v. *Wrightman*, (Poph. 56), speaking of grants, declares that "the law is not precise in the case of surnames, but for the christian name," he says, "this ought always to be perfect;" and throughout the early reports the christian name is uniformly referred to as the most certain mark of the identity of the individual in all deeds

or instruments.  Greater importance being attached to the chris-
tian name arose from the fact that it was the designation con-
ferred by the religious rite of baptism, while the surname was
frequently a chance appellation, assumed by the individual him-
self, or given to him by others, for some marked characteristic,
such as his mental, moral or bodily qualities, some peculiarity
or defect, or for some act he had done which attached to his de-
scendants, while sometimes it did not.   Camden mentions an in-
stance of a knight in Cheshire, each of whose sons took different
surnames, whilst their sons, in turn, also took different names
from their fathers.   They altered their names, he says, in respect
to habitation, to Egerton, Cotgrove, and Overton; in respect to
color, to Gough, which is red ; in respect to learning, to Ken-
Clarke, (a knowing  clerk or learned man) ; in  respect to qual-
ity, to Goodman ; in respect to stature, to Richard Little ; and
in respect to the christian name of the father of one of them, to
Richard son, though all were descended from William Belward;
and the gentlemen of Cheshire, he adds, bearing those different
family names, would not easily believe that they were all the
descendants of one man, were it not for an ancient roll, which
Camden saw.  Camden's Remains, (ed. of 1637), p. 141.  And Lord
Coke refers to the Year Books to show that a man may have
divers names, that is, surnames, at divers times.   Coke Litt. 3,
a.   The insufficiency of the christian name to distinguish the
particular individual, where there were many bearing the same
name, led necessarily to the giving of surnames ; and a man was
distinguished, in addition to his christian name, in the great
majority of cases, by the name of his estate, or the place where
he was born, or where he dwelt, or from whence he had come,
as in the name Washington, originally Wessyngton, which, as
its component parts indicate, means a person dwelling on the
meadow land, where a creek runs in from the sea, or else from
his calling, as John the smith, or William the tailor, in time
abridged to John Smith and William Taylor.  And as the
son usually followed the pursuit of the father, the occupation be-
came the family surname, or the son was distinguished from the

father by calling him John's-son, or William's-son, which, among the Welsh, was abridged to *s*, as Edwards, Johns or Jones, or Peters, which, as familiar appellations, passed into surnames. The Normans added Fitz to the father's christian name, to distinguish the son, as Fitz-herbert or Fitz-gerald. And among the Celtic inhabitants of Ireland and Scotland, where each separate clan or tribe bore a surname, to denote from what stock each family was descended, Mac was added to distinguish the son, and O to distinguish the grandson; and generally, where names were taken from a place, the relation of the individual to that place was indicated by a word put before the name, like the Dutch *Van* or French *De*, or a termination added at the end, which additions were in time merged into and formed but one word, until, from these various prefixes and suffixes, numerous names were formed and became permanent. So, as suggested, something in the appearance, character, or history of the individual gave rise to the surname, such as his color, as black John, brown John, white John, afterwards transposed to John Brown, &c.; or it arose from his bulk, heighth, or strength, as Little, Long, Hardy, or Strong; or his mental or moral attributes, as Good, Wiley, Gay, Moody, or Wise; or his qualities were poetically personified by applying to him the name of some animal, plant, or bird, as Fox or Wolf, Rose or Thorn, Martin or Swan; and it was in this way that the bulk of our surnames, that are not of foreign extraction, originated and became permanent. They grew into general use, without any law commanding their adoption, or prescribing any course or mode respecting them; for I know of but one instance of a positive statute commanding the taking of names or regulating the manner of selecting them, and that was limited to a particular locality. In the fourth year of the reign of Edward IV. an act was passed compelling every Irishman that dwelt within the English pale, to take an English surname, and enacting that it should be the name of some town, or of some color, as black or brown, or of some art or occupation, or of some office, which led to an extensive change of names in that part of Ireland, as a non-compliance was attended with a

Petition of John Snook.

forfeiture of goods. But, though for several centuries the practice of giving or assuming surnames was general, it extended little farther than the particular individual of which it was the designation or mark. His descendants adopted it or not, at pleasure, or he assumed a new name himself, or others conferred upon him some characteristic appellation, which adhered to him and his descendants. This fluctuation and change, however, was materially arrested by a statute, passed 1 Henry V., c. 8, called the Statute of Additions, which required not only the name of the individual to be inserted in every writ or indictment, but, in addition, his calling, his estate or degree, and the town, hamlet, or place to which he belonged. And in the reign of Henry VIII., Cromwell, the secretary of the king, established a regulation, by which a record was required to be kept in every parish of births, marriages and deaths; a regulation which, in connection with the previous act, operated to check the caprice of individuals in the matter of their names, and to fix them as durable appellations, for every man's name thereafter became a matter of record at his birth, his marriage, and at his death; and this re cording of such events in every family, led to the use of one name to designate the members of one family, which the record served to perpetuate; transmitting it from father to son, until the practice became general for all descendants to bear, and become known by, the name of a common ancestor. But this was the work of several centuries, and even at the present day, in remote and sparsely settled districts of England and Wales, the practice is not entirely extinct of assuming and changing surnames. All this, it will be seen, was brought about without any positive provision of law, other than those that have been referred to. By a usage, sufficiently general to be called universal, the son now bears the name of the father, and in turn transmits it to his own male descendants. Surnames, from their infinite variety, have now become a more certain mark of identity than the first name, for the whole number of christian or first names now commonly in use do no not exceed six hundred, while the directory of this city exhibits no less than twenty thousand varieties of surnames.

It is the combination of the christian and surname that now marks the individual's identity; and he is distinguished still more accurately by the use, now very general, of middle names or initial letters.

But though the custom is wide spread and universal, for all males to bear the name of their parents, there is nothing in the law prohibiting a man from taking another name if he chooses. There is no penalty or punishment for so doing, nor any consequence growing out of it, except so far as it may lead to or cause a confounding of his identity. In some countries it is otherwise. In France, a law was passed in the second year of the first revolution (*L.* 6 *Fructidor, Au. II.,*) and another (19 *Nivose, Au. VI.,*) which is still in force (*Codes Francais par Bourguignon et Royer—Collard,* § 34 and note; *Dictionaire de Legislation Universal par Chabal—Chameane,* vol. 2, p. 266,) forbidding any citizen to bear any first name (*prenom*) or surname, than that which is expressed in the registry of his birth, or to add any surname to his proper name; but no enactment of the kind has ever been passed in England or in this state, but, on the contrary, there have been many instances in which individuals have changed their names and held offices of public trust, and become distinguished by the name they adopted. The poet Mallet may be cited as an illustration. His father was of the clan of the Macgregors; and when that clan was suppressed, and its name abolished by law in consequence of the violent acts of Rob Roy, he took the name of Malloch, by which name the son was known until he came to London in his twenty-sixth year, when, disliking his Scotch patronymic, he adopted the French name of Mallet, and by this name held an office under government, became distinguished in literature, and transmitted the name to his descendants. That such instances rarely occur, may be readily accounted for in the fact of the absence, usually, of any object to induce a man to change his name. In the circumstance that there is generally a just and honorable pride in bearing the name of one's ancestors, and in the further fact that it is scarcely in the power of a man to change his name, unless he goes to a

place where he is unknown; for as long as he continues to abide where he is known, people will continue to call him him by the name to which they are accustomed.

It is this difficulty, I apprehend, mainly, that led to the practice of applying for the king's license, or the passage of a statute, in cases where the taking of a new name had become necessary in consequence of the devise of an estate upon that condition, as all persons will conform to what is decreed or enjoined by the sovereign authority of the state. Lord MANSFIELD seems to have thought, in *Gulliver* v. *Ashby*, (4 Bur. 1940), that the king's license, or an act of parliament, was essential to entitle a man to assume another name; but in later cases the right of an individual to take another name, without the king's license or an act of parliament, has been distinctly recognized; and the validity of acts done in the adopted name have been sustained even where they imposed a charge upon the public. In *The King* v. *The Inhabitants of Billinghurst*, (3 Maule & Sel. 250), the question was, whether a pauper, whose baptismal and surname was Abraham Langley, and who, by that name, had a legal settlement in Billinghurst, could, with his wife and family, be charged upon that parish. He was married in another parish by the name of George Smith, and had been known in that parish for three years before his marriage by that name. The wife and children had no settlement in Billinghurst, unless they had acquired one by the marriage, and the point involved was the validity of the pauper's marriage by the name of George Smith; the marriage act of 26 Geo. II, c. 33, rendering it essential to the validity of a marriage that there should be a publication beforehand of the "*true* christian and surnames" of the parties. It was insisted that this had not been done—that the marriage was, therefore, void, and that the wife and children were not chargeable upon the parish of Billinghurst; but the court held that the publication of the banns by the name of George Smith—that being the name which the pauper had gained by reputation, and by which he was known at the time in the parish where he was married—was a publication of the true name within the meaning

of the act. In a note at the end of this case, several decisions of Lord STOWELL, in the Consistory Court, are collected. In one of them (*Frankland* v. *Nicholson*) Ann Nicholson was married, and the banns published by the name of Ann *Ross*. Sir WILLIAM SCOTT, in reply to the argument that the proper christian and surname of a party could not be altered except by the king's license or an act of the legislature, said, that there might be cases where names, acquired by general use and habit, would be taken as the true christian and surname of a party, but as there was not sufficient evidence in the case before him to show that the woman had ever been known by the name of Ross, he annulled the marriage. In another case before him, (*Mayhew* v. *Mayhew*), which was a proceeding for a divorce upon the ground of adultery, the woman set up that she had never been legally married, having been described in the publication of the banns as Sarah Kelso, when her real name was Sarah White. It was shown, in reply, that she had gone by several different names, but was generally known by the name of Kelso before the marriage, and upon this evidence he held the marriage to be valid.

*Doe* v. *Yates* (5 Barn. & Ald. 544,) is a case still more distinctly in point. An estate was devised upon condition that the devisee should take the surname of the testator. The will provided that, within three years after the devisee arrived at the age of twenty-one, he should procure his name to be altered to the testator's name of Luscombe, by act of parliament or in some other effectual way. The devisee, before he was of age and before he entered upon or was let into the possession of the estate, took the name of Luscombe, which name he continued thereafter to bear. At twenty-one he took possession of the estate, but suffered the three years to go by, without applying for the king's license or an act of parliament, to entitle him to use the name of Luscombe, and he continued to hold and enjoy the estate for eight years thereafter, when he conveyed it to the defendants. It was insisted that he had forfeited the estate by having failed to comply with the testator's directions within the three years after he reached twenty-one, in not obtaining or applying for the king's license, or

an act of parliament authorizing him to take the name of Luscombe. But the court gave judgment for the defendants, holding that the devisee had sufficiently taken the testator's name, and that it was not necessary for him to apply for an act of parliament or for the king's license. "A name," said Chief Justice Abbott, in delivering the judgment of the court, "assumed by the voluntary act of a young man at his outset into life, adopted by all who knew him, and by which he is constantly called, becomes, for all purposes that occur to my mind, as much and effectually *his* name as if he had obtained an act of parliament to confer it upon him;" and there are numerous cases, both in this country and in England, holding that where a man enters into a contract or does any act in a particular name, that he may be sued by the name that he used, whatever his true name may be, and generally that wherever a man has done an act in a particular name, or where he makes a grant, that it may always be shown in support of the validity of the act, that he was known by that name at and about the time when the act was done, though he may have been baptized or previously known by a different name. All that the law looks to is the identity of the individual, and when that is clearly established the act will be binding upon him and upon others. *Waterbury* v. *Mather*, 16 Wend. 611; *Griswold* v. *Sedgwick*, 6 Cow. 456; *Jones' Estate*, 27 Penn. 336; *Prettyman* v. *Wales*, 4 Harring. 299; *Toole* v. *Peterson*, 9 Ired. 180; *Selman* v. *Shackelforde*, 17 Geo. 615; *Williams* v. *Bryant*, 5 Mees. & Wels. 447; *Finch* v. *Cocken*, 5 Tyrw. 774; *Attorney-General* v. *Hawkes*, 1 Cro. & Jer. 120; *The Queen* v. *Avery*, 18 A. & Ellis (N. S.) 576; Comyn's Digest, Fait. E. 3.

I have gone into the examination of this question so minutely because it has never, so far as I am aware of, been previously investigated; and into the origin of the usage that now prevails in respect to names, because the works commonly referred to on matters of general knowledge are exceedingly barren of information upon the subject of personal nomenclature. The result of this examination shows, I think, there is nothing in the law to prevent the petitioner from continuing to call himself John

Pike. If, as stated in the petition, he adopted it some years ago, engaged in business by that name, and is known among his business acquaintances and customers by that designation, there is no reason why he should not continue to use it. Any contract or obligation he may enter into, or which others may enter into with him by that name, or any grant or devise he may hereafter make by it, would be valid and binding; for, as an acquired and known designation, it has become as effectually his name as the one which he previously bore. I have no hesitation, therefore, in saying that I think he may lawfully use it hereafter, in all transactions, as his name or designation.

Application refused.*

---

\* By an act of the legislature passed March 17, 1860, (see Laws, p. 125), the power of the court was very materially enlarged in respect to permitting a person to assume another name; by amending § 3 of the act of 1847 (see Laws 1847 ch. 464) so as to read as follows:

" If the court to whom such application shall be made, shall be satisfied by such petition, so verified, or by affidavits presented, that there is no reasonable objection that such person should assume another name, such court shall make an order authorizing such applicant to assume such other name from and after some time, not less than thirty days, to be specified in such order. It shall be the duty of the county clerks of the several counties of this state, except the city and county of New York, and of the clerk of the Court of Common Pleas for the city and county of New York, annually, in the month of December, to make a return to the office of the secretary of state, of all changes of names of persons made under and by virtue of this act; and the names of such persons before and after such changes, as the same shall appear in such returns, shall be published in tabular form with the session laws of each year."