## SANGO *et al.* v. PARKS *et al.*

No. 2852.  Opinion Filed September 23, 1913.

Rehearing Denied November 17, 1914.

(143 Pac. 1158.)

1. **COMPROMISE AND SETTLEMENT—Binding Effect.** Voluntary settlements are so favored that if a doubt or dispute exists between parties with respect to their rights, and all have the same knowledge, **or means of obtaining knowledge,**

Sango et al. v. Parks et al.

concerning the circumstances involving these rights, and there is no fraud, misrepresentation, concealment, or other misleading incident, a compromise into which they thus voluntarily enter must stand and be enforced, although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed had the controversy been brought before it for decision.

2. **APPEAL AND ERROR—Finding of Fact—Verdict.** Where a cause is tried to the court without the aid of a jury, the court's findings of fact will be given the same weight as the verdict of a jury, and will not be set aside if there is any evidence reasonably tending to support it.

(Syllabus by Robertson, C.)

*Error from District Court, Muskogee County;*

*Chas. Bagg, Special Judge.*

Action by Ellen Sango and others against Laura Parks and others, to cancel deeds to real estate. Judgment for defendants, and plaintiffs bring error. Affirmed.

*Preston C. West* and *Horace Speed,* for plaintiffs in error.

*Bailey, Wyand & Moon;* for defendants in error.

Opinion by ROBERTSON, C. This is an action begun in the district court of Muskogee county, on December 2, 1908, by Ed and Ellen Sango, husband and wife, against O. F. Parks, to cancel certain deeds to three separate quarter sections of land, the same originally being the allotments of Minnie, Rosa, and Luanna Sango, deceased minor children of said Ed and Ellen Sango. Since the commencement of this action Ed Sango, one of the plaintiffs, and O. F. Parks, the original defendant, have died and the cause has been revived and now proceeds in the name of Ellen Sango, Nettie Herred, Priscilla Sango, Benjamin Sango, Will Sango, Mary Sango, a minor, Robert Sango, a minor, Clarence Sango, a minor, and Ellen Sango, as guardian and next friend of said minors, Mary, Robert and Clarence Sango, plaintiffs in error, against Laura Parks, Oakley Fay Parks Brown, Annie L. Parks, a minor, Goldie Ray Parks, a minor, Dorothy C. Parks, a minor, Lonnie O. Parks, a minor, and Laura Parks,

as guardian and next friend of said minors, Annie L., Goldie Ray, Dorothy C. and Lonnie O. Parks, and Laura Parks, as the administratrix of the estate of O. F. Parks, deceased, defendants in error. The judgment of the trial court was in favor of the defendants, and plaintiffs appeal.

Many alleged errors are assigned in the petition in error, but all are treated together in the briefs; but, from a careful perusal of the petition in error and the briefs and record presented, we conclude that plaintiffs' arguments are based upon the seventh and eighth assignments, to wit:

"(7) The court erred in rendering his decision and judgment against the plaintiffs and in favor of the defendants.

"(8) The court erred in overruling plaintiffs' motion for a new trial."

It is the theory of plaintiffs that the deeds to the land were obtained by undue influence, duress, and fraud. This is the only question in the case. On November 26, 1904, Ed Sango borrowed a sum of money from Parks and gave him as security therefor a warranty deed to the allotment of Luanna Sango, a deceased unmarried minor daughter of Ed and Ellen Sango. The Sangos were illiterate Creek freedmen. On January 5, 1905, Sango borrowed some more money from Parks and gave another warranty deed, by which he attempted to convey the allotments of Minnie and Rosa Bell Sango, both deceased unmarried minor daughters and sisters of Luanna Sango, the allottee of the quarter section first above mentioned. On February 14, 1905, Ed and Ellen Sango made, executed, and delivered to Parks three separate warranty deeds to the above mentioned and described allotments, the consideration being described as $300 in each deed. On September 16, 1905, Ed Sango gave Parks a chattel mortgage on all his horses and cattle to secure the payment of $520. This chattel mortgage appears to have been given without any consideration. Parks, in the summer of 1906, attempted to enforce the payment of the debt secured by the chattel mortgage. No possession has been given of the land under

Sango et al. v. Parks et al.

the deeds mentioned, and plaintiffs charge all sorts of fraud and deceit, on the part of Parks, to secure the conveyances to the land. When Parks attempted to foreclose the chattel mortgage Sango went to see a firm of lawyers in Muskogee, and as a result they paid off the $520 chattel mortgage and took from him another on the live stock, and a deed on one of the three allotments to secure them for the payment of the $520 debt, and also their fee, for a suit which they then brought against Parks to cancel the deeds given him by the Sangos. Parks filed his answer to this suit on October 3, 1906. Shortly thereafter Parks met Ed Sango on the street and offered to compromise their troubles; after several interviews the terms of the settlement were agreed upon. Sango called upon his attorneys and told them of the settlement. They told him not to have anything to do with Parks. It seems, however, that Sango, for some reason or other, determined to settle and told his lawyers so, although they again advised him not to do so; but seeing that the Sangos had made up their minds to settle, the lawyers refused to have anything further to do with the transaction, although they refused to release the mortgage or quitclaim the land back until their fee was paid. The settlement between Parks and the Sangos was reduced to writing and signed by all the parties. Ed Sango signed his own name, his wife signed by mark, her signature being witnessed by three different persons. After the settlement had been agreed upon and reduced to writing Sango took it to his lawyers for their signature, and, Parks, at Sango's request, agreeing to pay their fee, they signed the same, and it was presented to the judge of the United States court at Muskogee for judgment. The stipulation of settlement and for final judgment is in words and figures following:

"Ed Sango and Ellen Sango, Plaintiffs, v. O. F. Parks, Defendant. No. 6825.

"Decree.

"Whereas, heretofore, to wit, on the 16th day of November, 1906, in settlement of all the differences between the plaintiffs

and the defendant in the above-entitled cause, the following stipulation was entered, to wit:

" 'Ed Sango and Ellen Sango v. O. F. Parks, Equity 6825.

" 'Stipulation.

" 'It is hereby stipulated and agreed, by and between the parties to this action, that the said action and cause of action have been settled between the said parties as follows: The defendant pays to the plaintiffs the sum of three hundred dollars, cash in hand, and also pays for the plaintiffs the fees of their attorneys, De Graffenreid & Scruggs, in this action; said defendant further takes up for the plaintiffs from said De Graffenreid & Scruggs two notes of plaintiffs secured by chattel mortgages, said notes being for the sum of two hundred and eighty-three and fifty cents each and interest upon which note the defendant indorses the sum of two hundred dollars and agrees to hold said notes and security until the first day of January, 1907, before enforcing collection of the balance thereon, except so far as is necessary to protect his security.

" 'In consideration whereof it is further stipulated and agreed by and between the said parties that the defendant is the absolute owner of all the right, title and interest which the plaintiffs, Ed Sango and Ellen Sango. had as the father and mother and sole heirs of Minnie Sango, Rosa Bell Sango and Luanna Sango (deceased) in and to the southeast quarter of section one (1) and the northeast quarter of said section one (1), township fourteen (14) north, range seventeen (17) east, and the northwest quarter of section one (1), township eighteen (18) north, range thirteen (13) east, in the Creek Nation and Western District of the Indian Territory and which interests were conveyed by the plaintiffs to the defendant, O. F. Parks, by two warranty deeds dated February 14, 1905, one of which is recorded at Muskogee, Indian Territory, in Record 36, page 272, and in Record 47, page 291, and the other of which is recorded in Sapulpa, Indian Territory, in Record K, page 447, and that said deeds are good and valid transfers of all the title to said lands.

" 'It is further stipulated and agreed that final judgment and decree in this cause be entered in accordance with this stipulation.

" 'ED SANGO,
                                            her
" 'ELLEN X SANGO,
                                            mark
                                            " 'Plaintiff.

                                    " 'O. F. PARKS,
                                            " 'Defendant.

" 'Witnesses to signature, contract and mark:

" 'W. B. TIPTON,

" 'PETER V. ZIEGLAR, JR.,

" 'J. L. DABBS.

                        " 'DE GRAFFENREID & SCRUGGS,
                                    Attys. for Plaintiffs.

                        " 'P. L. BURLINGAME,
                                    Atty. for Defendant.'

"And it appears to the court from the evidence offered that the defendant O. F. Parks had complied with all the conditions in the above and foregoing stipulation, and that he is the owner of the land described therein.

"It is therefore ordered, considered, and decreed by the court that the defendant is the absolute owner of all the right, title, and interest which the plaintiffs, Ed Sango and Ellen Sango, had as the father and mother and sole heirs of Minnie Sango, Rosa Bell Sango, and Luanna Sango, deceased, in and to the S. E. ¼ of section 1, and the N. E. ¼ of section 1, township 14 north, range 17 east, and the N. W. ¼ of section 1, township 18 north, range 13 east, in the Creek Nation, in what is now Muskogee and Tulsa counties, state of Oklahoma, which interests were conveyed by the plaintiffs to the defendant O. F. Parks by two warranty deeds dated February 14, 1905, one of which is recorded in the recorder's office at Muskogee in Record 36, page 272, and in Record 47, page 291, and the other of which is recorded in the recorder's office at Sapulpa in Record K, page 447.

"It is further considered, ordered, and decreed that the defendant is entitled to recover the possession of said property,

and, it appearing to the court that the decree was rendered in this case on November 26, 1906, but not entered of record, the same is entered now for then.

"JOHN H. KING, *Judge.*

"Indorsed: 'No. 6825. Ed Sango and Ellen Sango, Plaintiffs, v. O. F. Parks, Defendant. Decree. State of Oklahoma, County of Muskogee. Filed Sept. 12, 1908. Toney Matney, District Clerk.' "

The settlement having been made and signed on November 26, 1906, was presented to the judge of the United States court at Muskogee, and the trial docket of that court shows, in a memorandum in the handwriting of said judge, that judgment for defendant was entered as per stipulation filed, yet the formal entering of the judgment for some reason was omitted until September 12, 1908, when by proper *nunc pro tunc* order made by Judge John H. King, district judge of Muskogee county, it was duly entered and spread of record. No complaint is made that the judgment entered *nunc pro tunc* was not the identical judgment rendered, but not recorded, on November 26, 1906. Nearly two years intervened from the date of the settlement until this case was filed. The case at bar was tried before Hon. Chas. Bagg, special judge, and decided by him on November 21, 1910. At the request of the parties the trial judge made special findings of fact and conclusions of law, the same being as follows:

"State of Oklahoma, Muskogee County—ss.:
    "In the District Court.

"Ellen Sango *et al.* v. O. F. Parks. No. 585.

    "Journal Entry, Findings, and Decision.

"Come now the parties plaintiff by P. C. West and Horace Speed, their attorneys, and the defendant by De Roos Bailey, his attorney, and this cause comes on for trial, and evidence is introduced and the arguments of counsel are heard. And the court, being requested to make findings of fact and conclusions of law in his decision, and being duly advised in the premises,

makes his findings of facts, conclusions of law, and his decision in the words and figures following, to wit: ·

"First. That Luanna Sango, Belle Sango, and Minnie Sango were the children of the plaintiffs, that these children died prior to November 26, 1904, the date of the first deed in controversy, and that at the date of their deaths they were without issue.

"Second. That on November 26, 1904, the plaintiff Ed Sango made, executed, and delivered a deed to the defendant, conveying the allotment of Luanna Sango, that on January 5, 1905, the plaintiff Ed Sango made, executed, and delivered to the defendant two deeds, conveying the respective allotments of Rosa Belle Sango and Minnie Sango, and that all of said deeds were, in fact, mortgages to secure loans amounting to $200 made by the defendant to the plaintiff, Ed Sango, and the consideration recited in the several deeds were not the true consideration, but were in excess of the true consideration. These deeds will be hereafter referred to as mortgages.

\* \* \* \* \* \* \* \* \* \* \*

"Fourth. That on February 14, 1905, the plaintiffs Ed Sango and Ellen Sango made, executed, and delivered to the defendant O. F. Parks deeds to the said allotments of the said Luanna Sango, Rosa Belle Sango, and Minnie Sango; that at the time of the execution and delivery of said deeds the said mortgages described in paragraph third hereof, were unsatisfied; that, at said time, the plaintiff Ellen Sango received sum of $300 in cash from the defendant, and the plaintiff Ed Sango, received $100 in addition to what he had received under the mortgages referred to in paragraph third hereof; that at the date of the· execution and delivery of these several mortgages and deeds none of the parties knew just what interest the plaintiffs had in these several tracts of land; that at the date of the execution and delivery of the deeds described in this paragraph, the plaintiffs intended to convey whatever right, title, or interest they had in the lands described therein, but were acting without the advice or counsel of disinterested parties, and relied upon the representations of the defendant; that the defendant is an experienced business man, while the plaintiffs are ignorant and illiterate negroes.

"Fifth. That on September 16, 1905, the plaintiffs made, executed, and delivered to the defendant a chattel mortgage covering certain live stock and other property, purporting to secure the payment of an indebtedness of $520, but that, so far as appears from the evidence, the same was without consideration.

"Sixth. That after consulting several lawyers, the plaintiffs, by De Graffenreid & Scruggs, a firm of attorneys, instituted a suit in the United States Court for the Western District of the Indian Territory against the defendant, the object and purpose of which was to cancel the mortgages and deeds heretofore described; said suit was instituted on the 23d day of August, 1906, and on the 3d day of October, 1906, the defendant filed his answer thereto.

"Seventh. That after said suit had been instituted and the answer filed, the defendant Parks approached the plaintiff Ed Sango and proposed a settlement of the controversy; that at the invitation of defendant Ed Sango accompanied the defendant to defendant's office, and there discussed the matter of settlement; that during the conversation the defendant stated to the plaintiff Ed Sango that he, the defendant, would deal fairly with him; that it would not be necessary for him, Sango, to consult his attorneys in regard to the matter of such settlement; that some days later both the plaintiffs went to defendant's office and again discussed the matter of settlement of such suit; that plaintiff Ed Sango went to see his attorney, R. P. de Graffenreid, and informed him that they were about to settle said suit (that Mr. de Graffenreid advised the said Sango not to settle such suit), and stated to him that such a settlement would effectually cut off all the right, title, or interest of both plaintiffs in and to the lands in controversy; that some time later the plaintiffs and defendant arrived at a settlement of said suit; that the defendant either drew up or had drawn up all the papers for the settlement of said suit, and the judgment therein; that the plaintiffs executed the same; that at the time of the execution of said papers the plaintiffs had full knowledge of their rights in the premises, and knew that they were relinquishing their right, title, and interest in the lands in controversy, and that the defendant was probably acquiring the fee-simple title to said lands thereby; that neither the said de Graffenreid nor Scruggs were at any time or in manner acting for or in the interest of the defendant.

"Eighth. That the total consideration paid by the defendant to the plaintiff was but a small fraction of the value of the

Sango et al. v. Parks et al.

fee-simple title to the lands in controversy at the time these transactions took place.

"I make the following as the declarations of law applicable to the facts in this controversy:

"First.   The burden was upon the plaintiffs to show either: (a) That there was fraud, duress, or undue influence practiced upon them by the defendant at the time these several transactions took place; or (b) that, at the time these several transactions took place, there was such a confidential relation or that the defendant occupied such a superior position to the plaintiff as would put the burden upon the defendant to show that in such transaction he acted in good faith, and that no fraud, duress or undue influence was practiced upon the plaintiffs.

"Second.   That if at the time of the execution and delivery of the deeds mentioned in paragraph fourth thereof, the relation existing between the plaintiff and the defendant was that of mortgagor and mortgagee, then the burden was upon the defendant to show that the execution and delivery of such deeds were not the result of either fraud or undue influence, and for a fair, just, and reasonable consideration.

"Third.   That, if at the time of the settlement described in paragraph seventh hereto, for any reason the defendant occupied superior position to that of the plaintiffs in their dealings, then the burden is upon the defendant to show that the plaintiff duly understood and knew the nature and result of their acts, had the benefit of outside independent and disinterested advice, and that the transactions were fair and for a fair, just, and reasonable consideration, and unless such is shown by the evidence, the decree in this case should be for the plaintiff.

"DECISION.

"I am of the opinion, and so hold, that the deeds mentioned in paragraph fourth of the findings of fact hereof were not for a fair, just, and reasonable consideration, and they should be set aside, if the settlement described in paragraph seventh of the said findings of facts and deeds executed in pursuance thereof were the result of fraud, duress, or undue influence, or that the plaintiffs did not have the benefit of outside, independent, and disinterested advice, or did not have a full knowledge and understanding of the nature and effect of their acts, and that the consideration paid therefor was not a fair, just and reasonable one.

"I am of the opinion and so hold that at the time of the bringing of the suit by the plaintiff against the defendant mentioned in paragraph sixth of the findings of fact hereof defendant had ceased to occupy any superior position to the plaintiffs, and that thereafter the dealings had between the plaintiffs and the defendant were had with full knowledge and information as to the results and effect thereof, and that, while the consideration paid therefor was not the full value of the lands conveyed and the rights surrendered, yet they were not the result of the exercise of any fraud, duress, or undue influence by the defendant.

"Upon these grounds I find the issues of fact in favor of the defendant.

"It is therefore ordered by the court that the plaintiffs take nothing, and that this cause be dismissed, and defendant recover his costs herein taxed at $———. All of which is finally ordered, and decreed.

"CHAS. BAGG, *Judge.*"

The trial court found that the transactions between Parks and the Sangos prior to the so-called compromise settlement made and entered into on November 26, 1906, were had at a time when the plaintiffs were without the advice or counsel of disinterested parties and that the negroes relied upon the representations made by Parks, and that he occupied a superior position to them, in that he was an experienced business man and they were ignorant and illiterate Creek freedmen. To us it is clear that at that time Parks had all the best of the deal, and the deeds should have been canceled, subject to a lien sufficient to protect Parks for the money he had actually advanced. Parks evidently was of the same opinion, for when he was sued by de Graffenreid & Scruggs for the Sangos, he immediately sought the latter and opened negotiations for a compromise. This he undoubtedly had a right to do. He was successful in arranging terms and effecting a compromise, and this brings us to the real question in the case, *i. e.*, Was this compromise effected in a fair and honest manner, or was it the result of fraud and misrepresentation on the part of Parks? The trial court, after a full hearing of the case, with better opportunities to weigh the evi-

dence than we have, decided that the compromise settlement was fair, that at that time Parks had ceased to occupy any superior position to the plaintiffs, and that thereafter the dealings had between the plaintiffs and the defendant were had with full knowledge and information as to the results and effects thereof, and that, while the consideration paid therefor was not the full value of the lands conveyed and the rights surrendered, yet they were not the result of the exercise of any fraud, duress, or undue influence by the defendant. If there is any evidence in the record reasonably tending to support this finding, the judgment of the trial court must stand. This requires an examination of all the evidence.

The record shows that after de Graffenreid & Scruggs filed case No. 6825, in the district court of Muskogee county to cancel the deeds, Parks met Sango on the street and proposed a compromise. After some talk Sango went to his lawyers and told them that he was about to settle the case; Judge de Graffenreid told him not to settle; that both he and his wife would, by such settlement, be cut off of all right, title, and interest in the land. Sango and his wife, however, were determined to settle and, ignoring the advice of their lawyers, continued to negotiate until a final and complete settlement agreement had been concluded, which, after being reduced to writing and signed by the parties before witnesses, was, by Sango and wife, carried to de Graffenreid & Scruggs, his attorneys of record, for their signature, which, being obtained, they carried it back to Parks, and in company with him went to the First National Bank, where Sango requested Mr. J. L. Dabbs, president of said bank, to read the same over to them and explain it to them, which Mr. Dabbs proceeded to do. The testimony of Mr. Dabbs was given by way of deposition, and while the same is somewhat lengthy we feel justified in setting it out in full at this point. It follows:

"The deposition of J. L. Dabbs was taken on interrogatories and cross-interrogatories, which is as follows, to wit:

"1.   State your name, age, and residence.

"1.  My name is J. L. Dabbs, age 43 years, residence, Los Angeles, Cal.

"2.  State if you lived in the town of Muskogee, Ind. T., in the month of November, 1906.

"2.  I did.

"3.  State if you knew the plaintiffs in the above-entitled cause, and if you say that you do, state how long you have known them.

"3.  I have known the plaintiffs for several years.

"4.  State if you remember a transaction between the plaintiffs and the defendant O. F. Parks, which occurred in the First National Bank at Muskogee on or about the 16th day of November, 1906, when both Ed Sango and his wife were present, and if you state that you do, also state the nature of the transaction in full.

"4.  I remember a transaction between Ed and Ellen Sango, plaintiffs, and O. F. Parks, defendant, which occurred in the First National Bank of Muskogee at Muskogee, Okla., on or about the 16th day of November, 1906. O. F. Parks and Ed and Ellen Sango came to my desk at First National Bank and asked me to witness a deed and also a stipulation of judgment and compromise settlement. I took the papers, looked over them, and then read them to Ed and Ellen Sango, and explained to them fully that they were compromising all right, title, and interest in the lands mentioned in the instruments, and that neither of them would ever have any other rights in these lands, and that these deeds and stipulations settled forever the rights to lands in O. F. Parks. Ellen Sango and Ed Sango both said they fully understood that they were compromising and giving up all right, title, and interest they or either of them had in these lands.

"5.  State if you know anything about the defendant paying any money on that occasion to the plaintiffs, and, if so, how much he paid each of said plaintiffs, and how the payments were made; that is, were they made by check or in cash.

"5.  I remember O. F. Parks handing Ellen Sango a check for her one-half and Ed Sango a check for his half.

"6.  State whether you signed any instruments on that occasion as a witness, and, if so, what those instruments were.

"6. I witnessed a deed from Ed and Ellen Sango to O. F. Parks and a stipulation of judgment and settlement from Ed and Ellen Sango to O. F. Parks.

"7. State whether or not said instruments, or either of them, were read to the plaintiffs by yourself, or Parks.

"7. I read the instruments to plaintiffs.

"8. State whether or not the said instruments, or either of them, were explained to the plaintiffs, and, if so, by whom.

"8. I explained fully and in complete detail the instruments to plaintiffs.

"9. State whether or not during said transaction the defendant stated to the plaintiffs that the agreement and deed which had been previously executed by them to defendant were final and complete settlement and compromise of all their differences touching the lands of plaintiffs' children, to wit, Minnie, Rosa Bell, and Luanna, and that in executing said instruments that plaintiffs were forever disposing of all right, title, or interest that they had in the allotments of said three children.

"9. During the transaction the defendant stated to the plaintiffs that the agreement and deed which had been previously executed by them to the defendant were final and complete settlement and compromise of all their differences touching the lands of plaintiffs' children, and that they were forever disposing of and giving up all right, title, and interest in said allotments.

"10. State whether or not the amount of consideration which plaintiffs were to receive was discussed, and, if so, what it was, and how it had been paid, or was to be paid, and whether or not the terms and conditions of the deed and agreement were fully and accurately explained to the plaintiffs, and whether or not they were acquainted with the terms and conditions of the deed and compromise, and what they said, if anything, indicating that they understood the terms of said instruments and were satisfied with the same.

"10. The amount of consideration was discussed and paid by defendant to plaintiffs by check on the First National Bank of Muskogee, the terms, conditions, and agreement were fully and accurately explained to the plaintiffs, and both Ed and Ellen

Sango stated they understood well and perfectly the terms and conditions of the deed and compromise, and that they were perfectly satisfied with them.

"11.    State any other fact, or facts, you may know pertinent to the issue.

"11.    The explanation of every detail of the transaction was as full and complete as it is possible for a person to make it.

### "Cross-Interrogatories.

"First.    Had you any personal interest in the matter of Mr. O. F. Parks' transaction with the negroes, Ed Sango, and Ellen Sango?

"First.    I did not.

"Second.    Had you any interest in the matter, except that you were requested by Mr. Parks to witness, as a disinterested person, a writing to which Parks' and Ed and Ellen Sango's names were attached?

"Second.    I had no interest whatsoever in the transaction only as a disinterested person requested to witness instruments of writing.

"Third.    Were you an interested or disinterested witness when attaching your name as witness to that instrument?

"Third.    Disinterested witness.

"Fourth.    What was your occupation, and where, at the time you attached your name as witness to the papers, on or about November 16, 1906?

"Fourth.    I was president of the First National Bank of Muskogee, Okla., and was at my desk in the bank when requested to witness the papers.

"Fifth.    Did you in fact see any of the parties actually sign their names to the papers, or were you simply told by Parks that they had signed the papers, and the negroes stood there assenting that they had signed the papers?

"Fifth.    I am not positive, but I think the papers were signed before the parties came to the bank.    The negroes stated

that they had signed the papers, and they understood perfectly that they were making a complete settlement and selling all right, title, and interest in the lands.

"Sixth. Is it not possible that the negroes did not understand the legal effect of the two or three pages of law terms in that stipulation?

"Sixth. No, it is not possible that the negroes did not understand—they understood perfectly that they were selling forever every right, title, and interest in the lands; they understood as much as it is possible to make them understand." (C.-M. pp. 194, 202.)

This evidence is corroborative of the testimony of Parks, W. P. Tipton, and Peter Zeigler. Judge de Graffenreid testified (120 and 127, Record) that he brought said suit No. 6825 for the plaintiffs against Parks in the United States court, and that said suit was compromised; that Ed Sango, after the suit was filed, came to his office and told him that he, Sango, had been trying to settle the case with Parks, and wanted to know what his attorney's fees would be; that he tried to get Sango not to settle in every way he could; that he told Sango he had sold his land once before to Parks, and had claimed that he did not understand it, and if he compromised again without witness' consent, witness did not want to hear from him any more; that he did not know what he was doing; and that some time afterwards Ed Sango came back to witness' office and presented a stipulation settling the case which had already been signed by the parties; that witness again remonstrated with him, and told him that if he executed that instrument and filed it in court, he absolutely conveyed all his interest in said land, but that Sango insisted on witness signing the agreement and he did so.

Sango's testimony is also corroborative of defendant's evidence, as may be seen by the follow excerpt:

"Q. If he had done what he says, you know how much that is? A. He was to pay me $700, and de Graffenreid $600. I can't figure. Q. If he had paid you what you say he had agreed to, then you would have been satisfied? A. Yes, sir; I

told him that. Q. And your only complaint now is that he didn't pay you what he agreed to pay you? 'A. That is what I am contending. Q. Now, you signed this agreement that purports to have been executed by you and your wife in his office, did you? A. Yes, sir; I suppose so. Q. Your wife signed it? A. Yes, sir; I guess so. Q. Who was present when it was signed? A. I don't know if any one was present. I couldn't tell you, but he had some one come in there, I suppose, but I don't know. Q. Did you sign the deed at the same time and place that you did the agreement? A. Well, I tell you what we did. The deed—I don't know whether—if I signed any deed, it must have been some of those papers. Q. You admitted to Mr. Speed that you signed the deed? A. Well, I signed a deed in the compromise. Q. Did you sign that deed at the same time you did the agreement, the compromise, and did your wife sign it at the same time? A. Yes, sir; she signed just like I did."

Again he said:

"Q. Did you acknowledge signing of the deed? Yes, sir. Q. Did your wife, too? A. Yes, sir. Q. Before whom? A. Before one or two parties; I don't know them. Q. Who was it read this agreement to you? A. Well, as I told him, one or two papers; that I think Mr. Dabbs read one paper to me. Q. I am talking about the transaction at the office; who read the agreement to you there? A. At his office? Q. Yes. A. I don't know whether it was a notary or not. Q. He read it to you? A. Yes, sir. Q. Who read it, the deed, to you down at the office? A. I don't know. Q. It was read to you? A. It was read. Q. And your wife was present when both the agreement and the deed were read? A. Yes, sir. Q. And it was after these instruments were read to you that you and your wife signed it, was it not? A. That is it. Q. In addition the terms and conditions of this agreement and the deed were stated to you by Mr. Parks and other parties before you and your wife signed either one of them, were they not? A. You will have to explain. (Record, page 283). Q. Do you mean to say that de Graffenreid and Scruggs didn't tell you time and again that when you signed this agreement and deed that you were signing away all your title to the land in this controversy? A. That lawyer did told me if I sold this now, that that was the end of it. Q. That was before you signed the agreement? A. Yes, sir. Q. You knew you were signing away all your right

and you knew your wife was signing away her right? A. Yes, sir."

Thus it seems that, while there was some unsettled differences between the parties prior to the compromise, yet all these were considered by them in the final settlement upon which the decree, *supra,* was entered. All were merged in that settlement and a new and additional consideration passed from Parks to the Sangos, which was understood and agreed to by them before the judgment was entered. This being true, can we disturb the judgment, in the absence of proof that there was fraud and deceit, or mutual mistake of law or fact, in its rendition? Can this court inquire into the compromise agreement, in the absence of fraud, to ascertain whether the settlement was fair and right? We think not. The parties were competent to contract; the subject of the controversy was one which the law permitted them to deal with; there were outstanding differences which all desired to settle, and as was said by Mr. Justice Brewer in *A., T. & S. F. Ry. Co. v. Starkweather,* 21 Kan. 322:

"It was a compromise of contesting claims, the termination of litigation, and the purchase of an outstanding and rival title. It will not do to say that the plaintiff had the better right; that it was the duty of the defendant, having only a naked legal title, and holding the same simply in trust for the owner of the full equitable title, to convey the same to such owner, and that therefore a conveyance, or promise to convey, was no consideration for a promise on the part of such owner, for the plaintiff was not in fact the owner of the full equitable title, and might never become such, and, again and chiefly after a compromise, made with full knowledge and without fraud or deception, of a *bona fide* controversy, the courts will not inquire which of the two contestants had the better right. It is enough that they had a controversy and have settled it, and the fact of the dispute upholds the settlement and its various stipulations. Upon such a settlement the court does not inquire what the facts really are. It accepts the statements which the parties have made as conclusive upon them. 'When it can be collected from the deed that the parties to it have agreed upon a certain admitted state of facts as the basis on which they contract, the statement of those facts, though

only by way of recital, estops the parties from proving the contrary.'   Herm. Estop. 234."

In the case of *Grandin v. Grandin,* 49 N. J. Law, 508, 9 Atl. 756, 60 Am. Rep. 642, the court said:

"The compromise of a disputed claim made *bona fide* is a good consideration for a promise, whether the claim be in suit, or litigation has not been actually commenced, even though it should ultimately appear that the claim was wholly unfounded— the detriment to the party consenting to a compromise, arising from the alteration in his position, forms the real consideration which gives validity to the promise.   The only elements necessary to a valid agreement of compromise are the reality of the claim made and the *bona fides* of the compromise.   *Cook v. Wright,* 1 B. & S. 559, 570; *Callisher v. Bischoffsheim,* L. R. 5 Q. B. 449; *Ockford v. Banelli,* 25 L. J. 504; *Miles v. N. Z., etc., Est. Co.,* 32 Ch. Div. 267, 283, 291, 298.

"The court will not inquire into the adequacy or inadequacy of the consideration of a compromise fairly and deliberately made.   *Naylor v. Winch,* 1 Sim. & Stu. 555; *Lucy's Case,* 4 Deg., M. & G. 356; 1 Story, Eq. Jur. 131; 2 Pom. Eq. Jur. sec. 855."

In 2 Pomeroy on Equity Jurisprudence, sec, 850, the author says:

"Voluntary settlements are so favored that if a doubt or dispute exists between parties with respect to their rights, and all have the same knowledge, *or means of obtaining knowledge,* concerning the circumstances involving these rights, and there is no fraud, misrepresentation, concealment, or other misleading incident, a compromise into which they thus voluntarily enter must stand and be enforced although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed had the controversy been brought before it for decision."

In 8 Cyc. page 505, will be found the following language:

"Unliquidated, Disputed and Doubtful Claims, in General. —The rule is well settled that an agreement of compromise is supported by a sufficient consideration, where it is in settlement of a claim which is unliquidated. where it is in settlement of a

claim which is disputed, or where it is in settlement of a claim which is doubtful."

On page 509 of the same work will be found the following:

"Good Faith as a Test.—The usual test, however, as to whether a compromise and settlement is supported by a sufficient consideration is held to be, not whether the matter in dispute was really doubtful, but whether or not the parties *bona fide* considered it so, and that the compromise of a disputed claim made *bona fide* is upon a sufficient consideration, without regard to whether the claim be in suit or not. The law favors the avoidance or settlement of litigation, and compromises in good faith for such purposes will be sustained as based upon a sufficient consideration, without regard to the merits of the controversy or the character or validity of the claims of the parties, and even though a subsequent judicial decision may show the rights of the parties to have been different from what they at the time supposed. The real consideration which each party receives under such compromise is, according to some authorities, not the sacrifice of the right, but the settlement of the dispute."

"Inadequacy of Consideration.—Although the want of consideration for a compromise may be inquired into, the adequacy thereof cannot be, and a compromise made in good faith will not be set aside for mere inadequacy of consideration."

In the case of *Hennessy v. Bacon,* 137 U. S. 78, 11 Sup. Ct. 17, 34 L. Ed. 605, the court said:

"He now contends that he was induced to make this settlement by false representations upon the part of Rogers, and because of the suppression of facts that ought to have been, but were not, communicated to him by Rogers. The evidence upon this point is quite conflicting, and does not justify the conclusion that Rogers made any false representations whatever; or that he withheld any facts he was under a legal obligation to disclose. Hennessy says that if he had known, when conferring with Rogers, that the latter had agreed to let Bacon have an interest in the lands, he would not have made the settlement; for that fact, he contends, would have indicated collusion between Rogers and Bacon. We do not see that ignorance of such facts affects the validity of the settlement of 1886, or that it would have prevented its consummation. If Hennessy had been informed of

Rogers' promise to give Bacon an interest in the lands, he would have known that such promise could not, under the circumstances, have been enforced. The money that Rogers paid Chittenden was his own, and in the title acquired by him Bacon had no legal interest. Rogers moved in the matter of the purchase from Chittenden entirely upon his own responsibility. With full knowledge of the title that Rogers had acquired. Hennessy deliberately chose to compromise the dispute between them, as shown by the agreement of 1886, and by the deeds executed in pursuance of its provisions. No fraud was practiced by Rogers. He was guilty of no unfairness. He concealed nothing that he was under legal obligation to state. His information in respect to the title was no greater than Hennessy had, *or than Hennessy could easily have obtained.* It is the case of the compromise of a disputed claim, the parties dealing with each other upon terms of perfect equality, holding no relations of trust or confidence to each other, and each having knowledge, *or having the opportunity to acquire knowledge, of every fact bearing upon the question of the validity of their respective claims.* *Cleaveland v. Richardson,* 132 U. S. 318, 329 [10 Sup. Ct. 100] 33 L. Ed. 384, 389. Such a settlement ought not to be overthrown, even if the court should now be of opinion that the party complaining of it surrendered rights that the law, if appealed to, would have sustained."

In the case of *Mateer v. Railway Co.,* 105 Mo. 320, 16 S. W. 839, the court said:

"The law favors the compromise and settlement of disputed claims. 'It is to the interest of the commonwealth that there should be an end to litigation.' If these settlements, fairly made and entered into, are to be disturbed upon frivolous grounds, it will often deter these companies from doing justice to their employees who have received injuries, for fear of future litigation. A wise policy would dictate that they be encouraged to do justice in these cases outside of the courts, and that their settlements should be sustained when they are just and fair."

In the case of *Chicago & A. Ry. Co. v. Green* (C. C.) 114 Fed. 682, the court said:

"And I may add that, if such settlements are to be disturbed because of the impression the judge may entertain that the amount of compensation was inadequate, it would estab-

lish a most uncertain and dangerous rule of law. If the employer, believing from the facts in his possession that there was no legal liability for the injury sustained by his employee, nevertheless recognizes a moral obligation to contribute aid of a substantial character to the unfortunate, under the circumstances surrounding his situation at the time, and the employee is willing to accept it, before a court takes upon itself the function of undoing such settlements, the evidence of fraud or incapacity ought to be made clear and persuasive."

We cannot, under the foregoing authorities, go back of the decree rendered in case No. 6825, *supra*. Its validity is in no wise impeached. It stands before us as a valid judgment of a court of competent jurisdiction, with all necessary parties before it. The evidence is strong and convincing that all the parties knew what they were doing at the time the compromise was made, and it seemed to be satisfactory to all concerned for two years. The evidence of Dabbs, Tipton, Parks, and Judge de Graffenreid, as well as Sango himself, ought to convince any reasonable man that the negroes were fully informed of the nature of the compromise and were satisfied with the terms thereof. Nor will the condition of this record warrant the charge that the compromise was effected by the Sangos without the advice of counsel. On the contrary, it plainly appears that they did have the advice and benefit of eminent counsel, who positively informed them as to the legal effect of the compromise and advised against it. This they solemnly admit. They refused to follow this advice. This they had a right to do. The advice of their counsel delayed the settlement for some time and enabled them to consider at length the effect of their acts. They were competent under the law, and should be held responsible for their deliberate acts and for their contracts entered into freely and without fraud or mutual mistake of fact. The lower court found, as a fact, that at the time the compromise was effected there was no relation of confidence and trust existing between the parties, and that when the agreement was signed the plaintiffs acted with full knowledge of their legal rights, and not under the exercise of fraud, duress, or undue influence. A careful

reading of the record warrants this conclusion, and the evidence, although conflicting in a measure, is sufficiently satisfactory to prevent an interference by us with that finding.

The case of *Bruner v. Cobb,* 37 Okla. 228, 131 Pac. 165, has been cited as an authority for the cancellation of these deeds on the ground of inadequacy of consideration. The rule there approved is that while mere inadequacy of consideration is not sufficient ground, in itself, for refusing the remedy of specific performance, yet when the inadequacy is so gross as to amount to fraud, or in the absence of other circumstances to shock the conscience and furnish satisfactory and decisive evidence of fraud, it will be sufficient ground for canceling a conveyance or contract, whether executed or executory. This rule is based on the theory that the court infers fraud as a fact, from the mere inadequacy of the consideration. In the case at bar evidence was introduced to show that before the compromise the plaintiffs went into the market to sell the land, and, failing to get a satisfactory offer, they returned to Parks and made a settlement. There were several witnesses as to the value of the property. This was a question of fact, and the trial court passed upon it adversely to the contentions of plaintiffs. In the *Bruner v. Cobb* case, *supra,* the plaintiffs sued to cancel the deed because of the fraud of defendants in offering to purchase one tract, yet writing the description of a different tract in the deed executed. The facts of the two cases are so wholly dissimilar that one is useless as an authority or precedent for the other.

There is no merit to the assignment that the *nunc pro tunc* order made by Judge King was entered without notice. Even though such notice had been required, it appears that the parties had sufficient information thereon to amount to full notice.

This case hinges entirely upon the facts; there is no dispute between the parties as to the law. Under the rule of this court, well established by precedent and warranted by reason, where a cause is tried to the court without the aid of a jury, the court's

finding of fact will be given the same weight as the verdict of a jury, and will not be set aside if there is any evidence reasonably tending to support it. *Spaulding Mfg. Co. v. Lowe,* 35 Okla. 559, 130 Pac. 959; *Town of Fairfax v. Giraud,* 35 Okla. 659, 131 Pac. 159; *Dewalt v. Cline,* 35 Okla. 197, 128 Pac. 121; *Roberts v. Mosier,* 35 Okla. 691, 132 Pac. 678; *Wat-tah-noh-zhe et al. v. Moore,* 36 Okla. 631, 129 Pac. 877.

Our sympathies naturally go out to the weak and ignorant, and courts, as a rule, go out of their way to protect the innocent when wronged. However, the state cannot act as guardian for every man who, being possessed of his faculties and properly advised, refuses such advice and acts upon his own judgment and thereby gets the worst of a trade. Without doubt Sango made a bad bargain, but he was warned in advance, and knew before he signed the deeds what the result would be. In the *Bruner v. Cobb* case, *supra,* the opposite was true.

The judgment of the district court of Muskogee county should be affirmed.

By the Court: It is so ordered.